**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Orange Jell BEECHUM, Defendant-Appellant.**

No. 76–1444.

United States Court of Appeals, Fifth Circuit.

July 11, 1977.

---

J. Waddy Bullion, Dallas, Tex. (Court-Appointed), G. Luke Ashley, Dallas, Tex., for defendant-appellant.

Michael P. Carnes, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

Orange Jell Beechum appeals from his conviction for unlawfully possessing a silver dollar knowing it had been stolen from the mail, in violation of 18 U.S.C. § 1708. In order to demonstrate at Beechum's jury trial the appellant's intent unlawfully to possess the money, the prosecution introduced evidence of other offenses Beechum may have committed. The chief issue on appeal is whether the district court properly applied this court's standards regarding the admissibility of other crimes evidence. We hold that the lower court failed properly to apply the test enunciated in *United States v. Broadway,* 477 F.2d 991 (5th Cir. 1973), which requires the prosecution to prove by plain, clear and convincing evidence the physical ingredients of the extrinsic offense that make it similar to the charged offense.[1]

I. Facts

Orange Beechum was employed as a substitute letter carrier for the United States Postal Service for about two and one-half years prior to September 16, 1975. On that date a postal inspector placed a "test letter" in a collection box on Beechum's route. The letter contained a greeting card, sixteen dollars in paper currency, and an 1890 silver dollar. The paper currency had been dusted with a powder visible only under ultraviolet light. Beechum collected the contents of the box at about 2:20 p. m. Subsequent inspection verified that the box was empty.

Investigators observed Beechum stop at a record shop that afternoon. At about 3:30 p. m., Beechum returned to the South Dallas postal station where he deposited the mail he had collected. The cash contents were missing from the test letter, which

had been opened and re-sealed. Government testimony indicated that Beechum's supervisor was present and accessible while Beechum was turning in the mail he had collected. Beechum said nothing to the supervisor regarding the letter.

Beechum left the station shortly after 4:00 p. m. The postal inspector stopped him, warned him of his *Miranda* rights, and proceeded to search him. On Beechum's person the inspector found the 1890 silver dollar that had been placed in the test letter. Ultraviolet light tests of Beechum's hands, billfold, and clothing proved negative. The inspector did not find the remaining cash contents of the letter. He did, however, find two Sears, Roebuck credit cards in the appellant's billfold. The credit cards bore names other than Beechum's.

At trial, Beechum's defense was that upon opening the collection box and sweeping its contents into his bag, the silver dollar had fallen out of the box. Beechum averred that he placed the silver dollar in his pocket, intending to turn it in to his supervisor, Cox. He was unable to do so, he contended, because the postal inspector apprehended him before he was able to locate Cox. The defense called two other postal employees, who testified that Beechum, prior to his arrest, asked them if they had seen Cox.

As part of the prosecution's case in chief, the government introduced into evidence the two credit cards found on Beechum's person. The court admitted this evidence over defense objection. At the close of the government's case, the defense announced that Beechum would testify regarding the events of September 16 but would invoke his privilege against self-incrimination in

---

1. We shall throughout this opinion use the terms "prior" or "extrinsic" similar offenses to refer generically to uncharged offenses or "other crimes." Identical rules govern the admissibility of uncharged offenses allegedly committed subsequent to the charged offense. *See United States v. Pollard,* 509 F.2d 601 (5th Cir.), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681, 423 U.S. 845, 96 S.Ct. 84, 46 L.Ed.2d 68 (1975).

It is important to note at the outset that the phrases "extrinsic offenses" and "other crimes" are used to refer not merely to evidence of convictions, but also to evidence of bad acts likely to induce the jury to believe that the defendant has committed a prior or subsequent criminal offense, regardless of whether defendant has been formally charged.

response to any questions about the credit cards. Beechum requested that the court instruct the prosecutor to refrain from asking questions about the credit cards. The court, observing that it had already admitted the cards as evidence of "a substantially similar offense," refused the appellant's request.

## II. Admissibility of Evidence of Prior Similar Offenses

Beechum argues on appeal that the trial court erred in admitting the credit cards into evidence and in allowing the prosecutor to cross-examine appellant regarding that evidence. Because we reverse on the admissibility of the cards, we need not reach the propriety of the prosecution's cross-examination.[2] Moreover we need not decide if the prosecutor's asking a witness on direct examination whether Beechum had explained his possession of the silver dollar, where the prosecutor specifically addressed his question to Beechum's post-*Miranda* warning conduct and knew that question would elicit a negative response, constituted

**2.** Beechum contends that it was error to allow the prosecutor repeatedly to ask questions he knew would result in the appellant's invoking his fifth amendment privilege against self-incrimination. Assuming that the cards were properly admitted and that the questions were within the scope of permissible cross-examination, it is by no means clear that Beechum was entitled to assert a fifth amendment privilege. In *United States v. Brannon,* 546 F.2d 1242 (5th Cir. 1977), the defendant on direct examination denied playing a role in the conspiracy to distribute cocaine for which he was on trial. This court assumed that on cross-examination the defendant could not assert a valid fifth amendment privilege in response to questions regarding his possession and use of cocaine, even though there were pending state charges stemming from the latter activities. We said that once the defendant voluntarily took the witness stand, he waived his fifth amendment right and "became obligated, as any other witness, to answer all relevant questions." *Id.* at 1246. Whatever the validity of this assumption when the cross-examination is designed to establish crucial links between a defendant and a conspiracy in which he denies any participation, a different situation may be presented when the prosecutor asks about prior similar conduct of a defendant that is otherwise unrelated to the charged offense and could give rise to criminal liability in the future. The scope of a defendant's waiver of his fifth amendment

plain error under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).[3] *See United States v. Stevens,* 538 F.2d 1203 (5th Cir. 1976).

### A. The Framework

■ We focus on the two Sears, Roebuck credit cards that the trial court admitted as evidence of prior similar offenses. Evidence of crimes or wrongs not charged in an indictment is, of course, inadmissible at trial unless it falls within one of the exceptions to this general rule. We have repeatedly noted that the general rule is "just and wise" in that it minimizes the grave danger that a jury will infer guilt of the charged offense from evidence of the prior offense or bad act or will seek to punish the defendant for the prior offense regardless of his innocence of the charged offense. *See United States v. San Martin,* 505 F.2d 918, 921 (5th Cir. 1974); *United States v. Goodwin,* 492 F.2d 1141, 1150 (5th Cir. 1974).

privilege upon taking the stand may not be co-extensive with the scope of permissible cross-examination itself, notwithstanding broad language to the contrary in *Johnson v. United States,* 318 U.S. 189, 195, 63 S.Ct. 549, 87 L.Ed. 704 (1943). The Advisory Committee on the Proposed Rules, Rule 611(b), F.R.Evid., notes that "the extent of the waiver of the privilege against self-incrimination ought not to be determined as a by-product of a rule on the scope of cross-examination."

**3.** Compare *United States v. Matos,* 444 F.2d 1071 (7th Cir. 1971), where the court reversed a postal employee's conviction for stealing two watches from the mail, in violation of 18 U.S.C. § 1708. At trial the defendant claimed that he accidentally stepped on a box containing a watch and placed it in his pocket, intending to return it to his supervisor. At trial, a postal inspector who arrested defendant and gave him *Miranda* warnings was asked the question, "Now, after this [giving *Miranda* warning] did you tell defendant anything?" The inspector answered that the defendant "indicated he did not desire to make a statement." The Seventh Circuit reversed, holding that the latter testimony violated the defendant's fifth amendment rights as a constitutionally impermissible comment on defendant's post-*Miranda* warning silence.

■ We have carved out exceptions to the general rule in order to serve limited prosecutorial and judicial purposes. These exceptions are narrowly construed lest they swallow the general rule. *See United States v. Miller*, 500 F.2d 751, 762 (5th Cir. 1974) *rev'd on other grounds*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The general rule and its exceptions are now codified in Rule 404(b) of the Federal Rules of Evidence.[4] Among the exceptions that allow a court to admit evidence of other offenses is that related to intent. That is, evidence of extrinsic offenses, misconduct, or acts similar to that charged may be probative of the defendant's intent to commit the charged offense. The intent exception to the general rule is apposite to the evidence in question here. Beechum was found with the silver dollar that had been placed in the test envelope. If he intended to turn in the silver dollar to his supervisor, he was innocent of the crime charged.

Finding an applicable exception to the general rule against the admission of other crimes evidence is, however, only the beginning of the inquiry. In recent cases applying Rule 404(b) we have repeatedly adhered to the framework for determining admissibility developed in our prior case law. For example, we delineated that approach in

*United States v. Taglione*, 546 F.2d 194 (5th Cir. 1977):

> Before an exception to the general rule may be invoked, the trial court must be satisfied that several prerequisites have been met: (1) there is plain, clear and convincing evidence of a prior similar offense, (2) the prior offense is not too remote in time, (3) intent is a material issue in the instant case, and (4) there is substantial need for the probative value of the evidence.

*Id.* at 199. Similarly, *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977) and *United States v. Bloom*, 538 F.2d 704, 708 (5th Cir. 1976), both cases applying Rule 404(b), denominate these criteria as "threshold prerequisites" that must be satisfied before the trial court may admit other crimes evidence.[5] *See United States v. San Martin*, 505 F.2d 918, 921 (5th Cir. 1974).

■ Our disposition of Beechum's appeal turns on the government's failure to satisfy the first of these threshold prerequisites, which we shall refer to as the *Broadway* rule. The requirement that the prosecution prove by plain, clear and convincing evidence the similar physical ingredients of the prior offense is a rule firmly fixed in the jurisprudence of this circuit.[6] Before ex-

---

4. Rule 404(b) provides:

    Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

    The Federal Rules of Evidence became effective on July 1, 1975, six months before Beechum's trial commenced.

5. Even if these threshold prerequisites are satisfied, however, the trial judge must examine this evidence, like all relevant evidence, in the universal solvent of Rule 403. Rule 403 provides:

    Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*See United States v. Bloom, supra*, 538 F.2d at 709; *United States v. Goodwin*, 492 F.2d 1141, 1150 (5th Cir. 1974).

6. The rule has been applied to an impressive variety of prior misconduct evidence offered to prove intent. *See United States v. Bloom, supra*, 538 F.2d at 709 (prior evidence of drug dealings); *United States v. Morrow*, 537 F.2d 120, 147 (5th Cir. 1976) (judgment of conviction but not underlying conduct involving conspiracy and possession of goods stolen from interstate commerce introduced to show intent on charge of transporting counterfeited and stolen securities); *United States v. Crockett*, 534 F.2d 589, 605 (5th Cir. 1976) (prior "bust out" attempts involving mail fraud introduced to show intent in fraud charged); *United States v. Rivero*, 532 F.2d 450, 455–56 (5th Cir. 1976) (testimony concerning dismissed charge of cocaine distribution); *United States v. Urdiales*, 523 F.2d 1245 (5th Cir. 1975) (prior narcotics transaction) *cert. denied*, 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976); *United States v. Madrid*, 510 F.2d 554, 556 (5th Cir. 1975) (confession that led to conviction of prior offense of

ploring in greater depth the development and rationale of this rule, it will be useful to summarize its application to the case at bar.

[4] The prosecution plainly, clearly and convincingly established only that Beechum possessed two credit cards not in his name. *Broadway* and its progeny establish the principle that only when the physical elements of the charged offense are matched by similar physical elements of the conduct alleged to comprise the extrinsic offense, and the latter elements are proved convincingly, may evidence of the extrinsic offense be admitted at trial. Construing *Broadway* as a *per se* rule, then, a showing merely that Beechum possessed two credit cards in others' names failed to establish the congruent physical elements of the charged offense. That is, Beechum was charged with possession of a stolen coin, but the government failed convincingly to establish that the credit cards had been stolen.

Alternatively, even assuming *Broadway* were no longer a *per se* rule, the rationale behind *Broadway* would still compel the exclusion of the other crimes evidence under the circumstances of this case. The policy question is whether the logical inference from Beechum's mere possession of the credit cards to Beechum's unlawful intent to possess the silver dollar is sufficiently strong to outweigh the prejudice involved. In the absence of evidence that the credit cards were stolen, considering the ease with which the truth of that fact could have been ascertained in this case, we would conclude that the probative value of the other crimes evidence was outweighed by its potential prejudicial impact.

We shall first examine *Broadway* itself, then analyze the rationale for analytically discrete elements of the *Broadway* test. We shall then apply the rule to the circumstances of the case at bar. Finally we shall assess the current vitality of the rule in light of Congressional adoption of the Federal Rules of Evidence.

### B. Broadway

The first full exposition of the "plain, clear and convincing" test is found in *United States v. Broadway, supra*, 477 F.2d at 995.[7] In *Broadway*, we reversed the conviction of a defendant at whose trial the court erroneously admitted evidence of prior offenses introduced to show intent or guilty knowledge. The defendant was charged with transporting in interstate commerce a falsely made and forged security (a money order) in violation of 18 U.S.C. § 2314. His defense was that he did not know that the money order he presented for payment had in fact been stolen or forged.

The prosecutor introduced two additional money orders from the same series as that which the defendant had tendered. The three money orders were part of a group of two hundred blank money orders that had been reported missing three weeks before defendant's charged offense. The two additional orders were also payable to the defendant and bore an endorsement similar

---

transporting illegal aliens); *United States v. Pollard*, 509 F.2d 601, 604 (5th Cir. 1975) (confession to subsequent offenses involving "till-tapping" of banks; *United States v. San Martin, supra*, 505 F.2d at 922 (prior conviction for assault and two misdemeanor convictions for opposing or interfering with police officer); *United States v. Cavallino*, 498 F.2d 1200, 1206 (5th Cir. 1974) (bank robberies); *United States v. Vosper*, 493 F.2d 433, 437–38 (5th Cir. 1974) (evidence that defendant had been seen short distance from prior robbery and was suspected of prior robbery offered to prove intent and common scheme, respectively); *United States v. Goodwin*, 492 F.2d 1141 (5th Cir. 1974) (arrest for prior drug importation; *United States v. Shadletsky*, 491 F.2d 677, 678 (5th Cir.), *cert. denied*, 419 U.S. 830, 95 S.Ct. 52, 42 L.Ed.2d 55 (1974) (state court conviction for selling liquor without license offered to prove intentional failure to pay liquor tax); *United States v. Fonseca*, 490 F.2d 464, 470 (5th Cir.), *cert. denied*, 419 U.S. 1072, 95 S.Ct. 660, 42 L.Ed.2d 668 (1974) (evidence that marijuana found in defendant's car at border two weeks prior to incident giving rise to marijuana importation charge).

7. The original *Broadway* version was "plain, clear, and conclusive." *United States v. Broadway, supra*, 477 F.2d at 995. As restated in *United States v. San Martin, supra*, 505 F.2d at 921, the word "convincing" is used instead of "conclusive."

to that upon the money order defendant sought to cash. A handwriting expert testified that all three endorsements had been made by the same person.

The prosecutor, however, failed to present evidence that anyone had tried to cash the additional money orders or had otherwise caused them to be transported in interstate commerce. This rendered the "other crimes" proof deficient with respect to an essential element of the charged crime of violating § 2314. *Id.* at 995. We reversed because the essential element of transporting, which would have been established by proof that Broadway had cashed the other checks, thereby placing them in the flow of commerce, had not been clearly and convincingly proved. This, it was felt, destroyed the requisite degree of similarity between the extrinsic acts and the charged offense. We held that

> When proof of an assertedly similar offense is tendered to establish necessary intent, the other offense proved must include the essential physical elements of the offense charged, and these physical elements, but not the mental ingredients of the offenses must be clearly shown by competent evidence.

*Id.* at 995.

■ To be sure, we did not hold in *Broadway* that the prosecution was obliged to prove beyond a reasonable doubt the defendant's guilt of the prior offense as a condition precedent to its admission. After all, similar act evidence is admissible to prove intent and for other purposes not because it may indicate the commission of a crime but in spite of that fact. 2 Wigmore, Evidence § 305 (3d ed. 1940).[8]

■ Rather, *Broadway* holds that the prosecution must prove by clear and convincing evidence that the defendant committed extrinsic acts that are similar to the acts forming the basis of the offense charged. The *Broadway* rule may be broken down analytically into three separate elements, each describing a necessary condition for the admission of other crimes evidence. Although in practice these elements tend to merge, it is useful to keep the distinctions in mind.

■ The first condition is the level of *similarity* between the physical components of the extrinsic and charged offenses. The second element of the *Broadway* rule is the *standard of proof* with respect to these physical components. The putatively similar physical components of the extrinsic offense must be proved clearly and convincingly by competent evidence. A third condition, implicit in *Broadway* but expounded in later cases, is the requisite similarity between the mental elements of the prior and charged offenses. It is usually as difficult to prove the mental element of the prior offense as it is to prove the mental element of the charged offense, which, of course, the prior offense is introduced to establish in the first place. Consequently, the mental element of the prior offense need not be "clearly" proved but may be inferred by the trier of fact from the totality of the circumstances. *Id.* at 995 n. 5. Nevertheless, there must be some basis for an inference of similarity between the mental elements of the extrinsic and charged offenses.[9]

We shall be concerned only with the first two of these principles.

---

8. *See United States v. Leonard*, 524 F.2d 1076, 1090–91 (2nd Cir. 1975) *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976). To suggest that the requirement that evidence of other crimes be "plain, clear and convincing" arises from a perceived need to ensure that a defendant is guilty of the extrinsic offense is to misconstrue the purposes of the rule.

9. In *United States v. San Martin, supra*, 505 F.2d at 922, there was no indication from the record whether the prior convictions intro-

duced by the prosecution included specific intent as a material element. Because merely the prior convictions themselves rather than the circumstances of the offenses were introduced, we held that the prior convictions could not be used to infer the *mens rea* of a charged offense requiring specific intent. The court reasoned that prior crimes requiring only general intent "are of meager, if any, probative value concerning the later existence of specific intent." *Id.* at 922.

### C. The Nature of Other Crimes Evidence and the Broadway Rule

#### 1. Similarity

█ The very nature of the inductive leap from past act to present intent renders critical the degree of similarity between the prior and the charged offenses. Congruence between the essential physical elements of the prior and charged crimes is essential to the validity of the logical inference. Once the court is persuaded that the inference may validly be drawn and outweighs possible prejudice, it properly leaves to the finder of fact whether the strength of the inference is such as to prove beyond a reasonable doubt the defendant's intent in the charged offense. The inherent uncertainty in the inference, however, as well as the grave risks of prejudice occasioned by evidence of extrinsic offenses makes imperative that the prosecutor first prove convincingly that the prior offense is a suitable point of departure for the logical leap to the present.

The essential feature of other crimes evidence is that it rests on what Dean Wigmore terms "the doctrine of chances." 2 Wigmore § 302 (3d ed. 1940). *See Weiss v. United States*, 122 F.2d 675, 683 (5th Cir.), *cert. denied* 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941). The prior commission of similar acts reduces the possibility that a conceded act of disputed intent—here Beechum's possessing the silver dollar—was *performed with innocent intent*. It is thus not any causal or otherwise factual link between the prior and charged offenses that supports the inference, but merely their similarity. Courts must as a consequence stringently apply criteria for determining what counts as "similar."

For example, suppose that a defendant, having shoved a customs officer, is on trial for wilfully interfering with the officer's performance of his duties. The government asserts that defendant's assault on the officer was unprovoked. The defendant claims that he did not mean to shove the officer. The government introduces as a prior similar offense the defendant's aggravated assault upon a bartender in order to show that defendant intended to assault the customs officer. Although the defendant's assault upon a bartender did not result in a conviction, let us say that the government convincingly proved that it took place.

It might be suggested that the evidence ought to be admitted because the prior offense illustrates that our defendant did not likely stumble accidentally against the customs officer. For any man sufficiently bellicose to assault a bartender, a customs officer is probably fair game. The flaw in this argument is, of course, that other crimes evidence may *not* be used to prove character or disposition, but only to prove (*e. g.*) intent; here the two situations are insufficiently similar to allow us to infer intent to strike the officer from the defendant's prior assault on a bartender. We properly adhered to a strict standard of similarity in the case from which this hypothetical was taken, *United States v. Sanchez*, 482 F.2d 5 (5th Cir. 1973). In ruling that the prior offense was inadmissible we said: "We are not persuaded that the charge against appellant of assault on a bartender is evidence of an intent to forcibly assault . . . a federal officer . . . ." *Id.* at 8.[10]

On the other hand, suppose that the defendant had "shoved" customs officers twice before at other border checkpoints. Although the conclusion that he intended to assault the customs officer on the occasion charged is by no means certain, we might view the prior and charged offenses as sufficiently similar to allow the jury to make

---

**10.** Another example of this principle, and a rather diverting one at that, is *United States v. Torrence*, 480 F.2d 564 (5th Cir. 1973). In that case we held that evidence that a defendant was "friends" with two widows who paid him large sums of money was inadmissible to prove intent at the defendant's trial for defrauding a third widow, to whom he made "amorous advances." *United States v. Jaqua*, 485 F.2d 193, 195 (5th Cir. 1973) ("There is no similarity or discernibility pattern between the transactions inquired into [alleged striking of a lady and destruction of property] and the offense charged [assault of a federal officer]".

the inference if it choses to do so.[11] Our reasoning is simple. The defendant might unintentionally have shoved one customs officer, but the likelihood that he would shove two or three accidentally is sharply reduced. We might, to be sure, have an unusually clumsy fellow, but the odds are we do not. Hence we think the inference from past act to present intent sufficiently strong to compensate for the potential prejudice.

It must be seen that the entire strength of the inference rests on the similarity between the prior and the charged offense.[12] There is no independent connection between these events, as in cases involving a common pattern or scheme, and no causal relation between the two, as in cases involving a prior crime adduced to prove motive. Rather, like cases involving a prior offense adduced to prove identity through *modus operandi*, the strength of the inference depends solely on the number and significance of features common to the prior and charged crime.[13] Consequently one must insist strictly on criteria of similarity.

By the same token, however, we must not demand perfect identity between the prior and charged offenses or impose mechanical requirements that lose sight of the underlying purpose of the rule. *Broadway's* requirement that the essential physical elements of the charged offense be matched by physical elements of the prior conduct allows a surprising degree of flexibility to this end.

Suppose, for example, there were separate crimes for stealing from the mails and stealing government checks from the mails. It would be foolish to prevent evidence of a

**11.** It should be noted in passing that the other crimes evidence in this hypothetical is still not clearly admissible. For one thing, one might still object to the lack of predictive value insofar as a prior crime "of the moment" has little to do with an intent that may subsequently arise. In other words, such evidence may have more to do with the defendant's overall character or disposition that with his intent at a particular time. *See United States v. San Martin, supra*, 505 F.2d at 923.

**12.** For example, in the classic circumstantial evidence case, there is a direct factual or causal connection between the evidence and the conclusion sought to be inferred. We know that Jeeves stood to inherit money on his master's death, that his master was killed by arsenic, that Jeeves bought arsenic several days before his master's death, and that Jeeves habitually served his master hot chocolate before bedtime. We infer from these circumstances both that the butler did it and that the killing was premeditated. But each circumstance relates directly to the killing if the theory is correct.

In the classic other crimes "intent" case, on the other hand, the prior crime has no necessary factual connection with the charged crime. The inference is, rather, based on the improbability that repeatedly similar results can be unintended. An accountant pleads that the error in the corporation's books is merely an inadvertent computational error. If we discover that there were similar errors in the last three previous tax years, we begin to suspect that the number of errors has become inconsistent with the hypothesis of innocent intent. The coincidence of these similar results is simply too improbable.

Shift the prior offense from the books of previous tax years to evidence that the accountant has been running an illegal gambling operation, and one destroys the validity of the inference that he intended the charged offense. The gambling business may show that the accountant is a bad man, but this is precisely the inference of character or disposition that Rule 404(b) and our caselaw forbids.

This analysis suggests that we ought carefully to distinguish between other crimes "intent" cases where, as here, the other crime is unrelated factually to the charged crime, and cases in which there is such a relation. *United States v. Cochran*, 546 F.2d 27 (5th Cir. 1977), falls in the latter category. In a prosecution for making false statements with intent to deceive licensed firearms dealers, evidence was introduced that the defendant paid for the firearms with bad checks. We held the other crimes evidence admissible because the bad checks tended to show that defendant was engaged in submitting known false statements to the dealers with the requisite intent of deceiving. That is, we reasoned that the contemporaneous act of paying for the firearm with a bad check tended to indicate fraudulent intent with respect to the firearms transaction itself. The strength of the inference in *Cochran*, then, was direct and not based solely on the "doctrine of chances." Consequently, similarity between the extrinsic and the charged offense was less important.

**13.** An "intent" case differs from a "modus operandi—identity" case in that the uniqueness of the common features is a necessary consideration in the latter but not the former.

prior offense of stealing government checks from being introduced in a prosecution for stealing private checks from the mail. Common sense tells us that intent to commit the latter may be strongly inferred from firm evidence that defendant has committed the former offense.

*Broadway* was clearly not intended to preclude the admission of such evidence. Rather, there must remain in the trial court some discretion to determine the level of generality at which to apply the *Broadway* rule. In other words, given the above hypothetical we would simply say that the fact that one statute specifies "government checks" does not make the latter element an essential physical element of the offense for purposes of determining similarity between prior and charged offenses.

We thus abstract from the prior and charged offenses a level of generality at which similarity will retain substantial probative value. This reasonable construction of the *Broadway* rule is precisely that which we have accorded it in the past. For example, in *United States v. Shadletsky, supra*, a state court conviction for selling liquor without a license was held properly admitted to show intent with respect to the charge of failing to pay a special tax required by federal law of retail dealers in liquor. 491 F.2d at 678. Both offenses presented essential physical elements of (1) selling liquor (2) without complying with the particular government-imposed condition precedent to that activity—in one case a license, in the other a tax. That a person who sold liquor failed to pay the costs of obtaining a license under circumstances that suggest his omission was intentional represents evidence from which it may validly be inferred that the same person's failure to pay the required liquor tax was probably not inadvertent.

We need not, under the circumstances of this case, engage presently in such subtleties. It should be clear beyond cavil that in a prosecution for possessing a silver dollar stolen from the mails, a prior offense in which the defendant possessed two credit cards stolen from the mails would be suffi-ciently similar to generate a valid inference of unlawful intent to commit the charged offense. It should be equally clear, however, that absent a sufficient showing that the credit cards had been stolen, and possibly an additional showing that they had been stolen from the mails, the prior offense is insufficiently similar to the charged offense. The next issue, then, is to determine what counts as a sufficient showing of the prior offense.

### 2. Standard of Proof

Given the critical importance of similarity between the prior and the charged offense when mental state is an issue, it would be surprising indeed had *Broadway* not established a relatively strict standard of proof for the ostensibly similar elements of the prior offense. As we have noted, *Broadway* stands for the proposition that although the mental elements of the prior crime may be inferred from the totality of the circumstances by the finder of fact, the congruent physical elements of the prior offense must be clearly and convincingly shown by competent evidence. 477 F.2d at 995, 995 n. 5. Before evidence of a prior offense is given to the jury, the trial judge should conduct an independent examination of the proffered evidence to determine whether it satisfies this standard. *Id.* at 995.

In *Broadway*, we might have allowed the jury to infer the missing element of defendant's cashing the two extrinsic money orders. We might have observed that because defendant had endorsed the money orders, it was obvious that he had tried to cash them. Instead, having determined that "transporting" the securities was a requisite element of similarity, this court found the proffer deficient because encashment was not convincingly demonstrated.

In *United States v. Vosper, supra*, 493 F.2d at 436–38, the court applied the *Broadway* "plain, clear and [convincing]" test to exclude evidence of a prior offense. At a trial for conspiracy to commit bank robbery, evidence that the defendant had been under surveillance because suspected of

committing prior bank robberies, that the defendant had been near the scene of a prior robbery, and that the defendant had been seen in the company of the man who carried out the charged robbery was inadmissible to show intent and common scheme.[14] In *United States v. Taglione, supra,* 546 F.2d at 199, the court invoked the "plain, clear and convincing" test and, apparently in applying it, held inadmissible evidence of a prior offense. The defendant, Taglione, had earlier been observed transporting a stolen painting to an undercover buyer. Robbery charges were filed against Taglione but were later dropped.[15] On appeal from Taglione's conviction for extortion, this court held that the prior offense was inadmissible not only because it would have been insufficiently similar even if it had been proved, as by a conviction, but also because it was not as a matter of fact proved.

■ Although none of these cases delineates precisely the "clear and convincing" standard, the parameters of the standard are not difficult to make out. On the one hand, we cannot require the prosecutor to prove the essential physical elements of the prior offense beyond a reasonable doubt, although when the defendant has been convicted of the prior offense this standard will be met as a matter of course. On the other hand, the importance to the logical inference of similar physical elements requires that we be reasonably certain that those elements existed. Requiring the prosecutor "clearly and convincingly" to prove those elements of the prior offense steers a reasonable middle course.

■ When evidence of the prior offense is the record of a final conviction, the problem of proof is less troublesome. The conviction is presumed valid, and the defendant bears the burden of showing that the conviction would likely fall to collateral attack because of some fundamental defect, such as the involuntariness of his guilty plea. *See United States v. Shadletsky,* 491 F.2d at 678.[16]

When the evidence of prior acts is not that of a final conviction, however, the government must do more than adduce some evidence of the prior occurrence. It must prove clearly and convincingly each congruent physical element of the putative similar offense.

### III. Broadway Applied

■ The essential elements of the offense of unlawful possession under 18 U.S.C. § 1708 include (1) proof of possession of the item in question, (2) proof that the item was stolen from the mails, (3) proof of knowledge that the item was stolen, and (4) proof of specific intent unlawfully to possess the item. *See United States v. Kimbrell,* 487 F.2d 219, 220–21 (5th Cir. 1973); *United States v. Martinez,* 466 F.2d 679, 687–88 (5th Cir. 1972) *cert. denied,* 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). The first two of these represent the physical elements of the offense, the latter two, its mental elements.

The government offered the following proof that Beechum had committed prior similar offenses:

**14.** Compare the following exchange, initiated by the prosecution, that took place during Beechum's trial:

Q. Why had you been conducting these test letters on Mr. Beechum?
MR. ASHLEY: Your Honor, I think that is irrelevant to the current prosecution.
THE COURT: Well, I think it's—I will overrule the objection—I think it's in response to the question asked on cross.
A. There had been several instances in which it had appeared that Mr. Beechum had probably been responsible for trepidation of the mails.

Because we reverse on the admissibility of the credit cards, we need not discuss whether the trial court's overruling defense counsel's objection was error.

**15.** Taglione claimed that he was only transporting the painting for a friend who needed a ride because of car trouble.

**16.** Once the defendant has discharged his burden of showing the invalidity of the prior conviction, the prosecution need not rehabilitate that conviction in order to introduce evidence of the underlying offense as a prior similar act. The burden of going forward with convincing evidence of the prior similar elements of that offense would simply shift to the prosecution.

(1) Business records of Sears, Roebuck indicating that the company approved credit card applications for Robert T. Locus and Luther McFarland on October 29, 1974 and November 27, 1974, respectively.

(2) A stipulation that a Sears representative would testify that it was the regular practice of the company to place credit cards in the mail within ten days of issuance.

(3) Testimony by the postal inspector that he found Sears cards in the names of Robert T. Locus and Luther McFarland in Beechum's possession on September 16, 1975.

(4) Testimony by the postal inspector that Beechum delivered mail on routes covering the addresses listed on the credit card applications for Locus and McFarland on one or more occasions between the dates of issuance and the date of the alleged offense—a period of about ten months.

### A. *"Plain, Clear and Convincing" Proof of Prior Similar Offenses*

The critical deficiency in the government's proof was its failure to show that the credit cards had been stolen. The essential links that might have established that fact circumstantially were Locus' and McFarland's non-receipt of the credit cards, or perhaps alternatively evidence of Beechum's unauthorized use of the credit cards. Were either of these facts true, it would have been an easy matter for the prosecution to obtain competent evidence of its truth. The government failed to offer evidence of either at trial.

It might, of course, be argued that even without establishing the addressees' non-receipt or the defendant's use of the cards, the government sufficiently proved that the credit cards had been stolen. The issue is whether the fact of Beechum's possessing two credit cards not in his name constitutes "clear and convincing" proof that the cards were stolen. We think it manifestly does not.

We do not question the validity of the inference from the fact of unexplained pos-

session of concededly stolen items to the conclusion that the possessor knew such items were stolen. *See Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973). In the case at bar, however, the essential matter of whether the credit cards were stolen was itself open to conjecture. This distinguishes Beechum's possession of the cards from otherwise similar conduct punished under 18 U.S.C. § 1708. In similar cases prosecuted under that statute, the fact that the checks possessed by a defendant have been stolen is established either directly, as by testimony of a witness to the theft, or circumstantially, by evidence that the addressees never received the checks, that the payees did not know the defendant, and often that the defendant cashed the check. *See e. g., United States v. Dobson*, 512 F.2d 615 (6th Cir. 1975); *United States v. Kimbrell, supra*, 487 F.2d 219; *United States v. Johnson*, 463 F.2d 216 (9th Cir.), *cert. denied*, 409 U.S. 1028, 93 S.Ct. 472, 34 L.Ed.2d 322 (1972); *United States v. Hughes*, 418 F.2d 1222 (5th Cir. 1969). To be sure, evidence of non-receipt tends to show that the checks were stolen from the *mails*. Evidence that defendant cashed a check made out to a payee who did not know him tends to show that the defendant *knew* the stolen character of the check. But both of these also tend to show, *a fortiori*, that the check was stolen.

The price of going forward with evidence of non-receipt by the addressees or of Beechum's using the cards, assuming these facts were true, would have been but a few minutes of the government's time. The price of omitting this evidence was the admission of dangerously prejudicial evidence of what the trial court termed "a substantially similar offense" without convincing verification of its similarity to the charged offense. One can "convincingly" infer no more from the government's proof than that Beechum's was an unexplained possession of the two credit cards.

It follows, *a fortiori*, that the government also failed to prove that the credit cards had been stolen from the mail. We preter-

mit the question whether the manner in which the cards were stolen was a requisite point of similarity between a prior offense sought to be admitted to prove intent and a charged violation of § 1708. As a practical matter the distinction may be of little import in Beechum's case, since evidence of Locus's and McFarland's non-receipt of the cards would convincingly demonstrate that the cards were stolen from the mail. *See generally United States v. Martinez, supra,* 466 F.2d at 687–883; *Allen v. United States,* 387 F.2d 641 (5th Cir. 1968).

At least one circuit has already answered in the negative the question we pretermit, while lending affirmative support to our decision on the question we reach. In *United States v. Fearns,* 501 F.2d 486 (7th Cir. 1974), the court addressed the issue of the admissibility of similar offenses for purposes of showing intent in a prosecution under § 1708. Defendants were charged with stealing government checks from the mails. A former codefendant testified that, in addition to the four checks that formed the basis of the charged offense, she had received from the defendants between twenty-five and thirty other checks, which she endorsed and cashed, splitting the proceeds with the defendants. The Seventh Circuit said that this evidence failed to show all the elements of the claimed prior similar crimes because it did not show, first, that the payees of the other checks were persons other than the witness, and second, even assuming the witness was not a payee, that the proper payees *had not authorized her* to endorse their names to the checks. "If this missing testimony had been supplied, the facts that the checks were stolen and known to be stolen could be inferred from the circumstances." *Id.* at 490.

The court went on to observe that it was unnecessary to prove that the checks were stolen from the mails. *Id.* at 490. We express no opinion regarding the Seventh

Circuit's view that *Broadway* would have required proving the manner in which the checks were stolen, but we firmly agree with that court's staunch insistence on proof that the checks had been stolen in some manner.

The government's reliance on *United States v. Robertson,* 460 F.2d 1250 (5th Cir. 1972) is misplaced. *Robertson* involved a postal employee charged with unlawfully possessing a department store credit card stolen from the mails in violation of § 1708. The government was permitted to show that the defendant gave a witness another credit card (the other card) from the same department store and that the witness and defendant went together to the department store to make purchases.[17] The court, while not specifically identifying this as other crimes evidence, admitted it as evidence tending to show defendant's knowledge that the card found in her possession was stolen from the mails. Although there was testimony regarding the non-receipt of the charged credit card, it is not clear from the opinion in *Robertson* whether the government also established the non-receipt of the other credit card. In any case, the defendant's *use* of the other credit card from the same department store, combined with defendant's admission that the card had been given her at the post office, provided sufficient circumstantial evidence that the card had been stolen. By contrast, in the case at bar there was no evidence how Beechum had received the credit cards and no evidence that he or anyone else had ever used them.

Finally, the fact that Beechum delivered mail to the addresses of the persons named on the credit cards on one or more occasions during the ten month period after the issuance of the cards does not indicate that the cards were stolen, and certainly not that Beechum stole them.[18] Evidence that Beechum delivered mail to the specified ad-

---

17. The witness also testified that she saw six credit cards from the same department store in the defendant's apartment. The admissibility of this evidence was not at issue on appeal, nor is there any indication whether the defendant objected to its admission at trial.

18. Of course, the government did not have to prove that Beechum stole the cards, merely that the cards were stolen. But the evidence fails convincingly to demonstrate even the latter proposition.

dresses within the ten day period after Sears approved the credit card applications might have been somewhat more persuasive, since the parties stipulated that it was Sears's practice to mail such cards within a ten day period. No such evidence was introduced at trial. That the specified addresses fell within Beechum's assigned route on one or more occasions during the ten month period proves little or nothing. Beechum was a substitute mail carrier. It is likely that thousands of Dallas addresses fell within one or another of his assigned routes at some point during this period. A credit card that was misplaced or otherwise came lawfully into Beechum's possession would likely have borne a Dallas address.

Nobody would doubt that the evidence adduced by the prosecution would have been insufficient to prove that Beechum's possession of the credit cards was a § 1708 offense. On the other hand, the standard of proving prior similar offenses falls short of a "reasonable doubt" standard.

There was at least some circumstantial evidence from which it could be inferred that the credit cards had been stolen. After all, carrying two credit cards not in one's own name is an activity that justly arouses our suspicions. At the same time, however, we must be sensitive to the critical importance of similarity in an other crimes context, and thus adhere to the "plain, clear and convincing" standard of proof. Had the prosecution gone forward with the evidence that the cards were stolen, such as the addressee's non-receipt of the cards or Beechum's unauthorized use of them, the burden of rebutting that evidence would have fallen to the appellant. But on the facts of this record we cannot say that the prosecution has carried its initial burden of showing clearly and convincingly that Beechum's prior conduct was similar to the charged offense, i. e., that the credit cards were stolen.

### B. *An objection to* Broadway's *Applicability*

The government's main argument on appeal is that *United States v. Simmons*, 503 F.2d 831 (5th Cir. 1974), precludes the application of *Broadway* to the case at bar. The government asserts that *Simmons* held that *Broadway* did not apply to cases in which the evidence of prior similar acts made out merely a similar occurrence rather than a prior criminal offense. Although we do not embrace that characterization as fully accurate, we think that even assuming the truth of that interpretation, *Simmons* is inapposite.

*Simmons* holds merely that in adducing evidence of prior similar acts, the prosecution need not demonstrate conclusively that those acts constitute a criminal offense. In this respect our opinion in *Simmons* merely reasserts the principle that evidence of prior similar acts is not admissible because it indicates the commission of a crime but in spite of that possibility. *See* 2 Wigmore, Evidence § 305 (3d ed. 1940); *see also* note 8 *supra*.

In *Simmons* the defendant was convicted of furnishing false financial statements to a federal land bank in violation of 18 U.S.C. § 1014. In order to show that the defendant's statements were knowingly false, the government introduced testimony of the former vice president of a corporation of which the defendant was the largest stockholder. The witness, Judd, testified that some years earlier, at a time when the corporation was seeking a loan from a bank, the defendant had undertaken to teach Judd how to mislead the bank by means of a false financial statement. On appeal the defendant apparently contended that the evidence should have been excluded because the government had failed conclusively to establish the commission of a criminal offense. We properly rejected this argument, observing that *Broadway* and its progeny did not hold "that proof only of acts which amount to a criminal offense are admissible." *Id.* at 835. We said that because Judd's testimony "was plain, clear and conclusive that Simmons possessed the requisite knowledge to falsify a financial statement to be presented to a bank in conjunction with a loan," the testimony was properly admitted to show intent or guilty knowledge. *Id.* at 835.

■ We must begin the analysis of *Simmons's* impact on *Broadway* by observing that *Simmons* cannot mean that when the proof adduced by the government fails to establish each element of a putative prior criminal offense, that evidence indicates merely a prior similar occurrence that need not meet the *Broadway* test. On that interpretation the mere failure to satisfy *Broadway* by proving the congruent physical elements of the prior offense would in many cases itself obviate the need to satisfy *Broadway*—an absurd result obviously not intended by *Simmons*. Thus the application of *Broadway* is not precluded merely because the government did not prove that the credit cards were stolen from the mail or seek to prove that Beechum knew they were stolen.

Nor is *Broadway* inapplicable merely because the government did not explicitly characterize Beechum's possession of the cards as a criminal offense. Of course, the trial judge did term Beechum's possession a "substantially similar offense," but the trial judge in *Simmons* so characterized the prior similar acts in that case. In any event the government's label, whether "prior occurrence" or "prior criminal offense," should not be determinative of whether the *Broadway* test must be satisfied. Insofar as *Simmons* is based on a belief that prior similar "occurrences" will be inherently less prejudicial than prior offenses, the prejudicial effect of admitting such evidence rests not on the label but on the inferences the jury is likely to draw, and it is this index of prejudice that ought to determine whether the full force of *Broadway* applies.

In the circumstances of this case we think it clear that the government intended to imply and the jury would naturally tend to infer that Beechum's possession of the credit cards was part of a prior offense. Indeed, absent such an inference the evidence had little probative value. In *Simmons*,

evidence that the defendant instructed Judd in the art of filing false financial statements was sufficient, without more, to show by "plain, clear and conclusive [proof] that Simmons possessed the requisite knowledge to falsify a financial statement . . . ." *Id.* at 835. That fact was independently relevant to the inquiry in *Simmons*. But the crime of which Beechum is charged requires no particular skill that might be shown by the mere possession of the credit cards. Unlike the simple act of instruction in *Simmons*, Beechum's possession of the cards conclusively demonstrated no independently relevant fact.

The shallowness of the government's position is indicated by the contradictory nature of its assertions. On the one hand, it assumes *Broadway* applies but claims that it satisfied that test. To do this it would have had to show that Beechum possessed stolen credit cards. On the other hand, as part of its argument that *Simmons* and not *Broadway* applies, the government protests that it never sought to prove that Beechum had committed a prior "offense" but merely sought to adduce evidence of a prior "occurrence." [19] The government cannot have it both ways of course, since if it had succeeded in its efforts to prove Beechum possessed stolen credit cards then it would have made out the physical elements of a criminal offense. The point is not that the government's alternative legal argument is improper, but rather that in fact the prosecution sought to have the jury believe, and fully expected it to believe, that Beechum had committed a prior criminal offense. Hence the admission of the credit card was still prejudicial even though the prosecution failed to prove that Beechum's possession of the cards was a criminal offense.

If the prosecution offers evidence that a defendant "was suspected" of committing a prior robbery, as in *United States v. Vosper, supra*, we do not fail to apply *Broadway* or

---

19. The government introduced at trial evidence that the credit cards were mailed and evidence that Beechum's mail route covered the addresses to which the cards were mailed. The only conceivable relevance of these facts was to buttress the government's intended implication that Beechum stole the cards from the mails. This in itself is sufficient to dispose of the government's disingenuous contention that it did not seek to introduce evidence of a prior criminal offense.

to find this evidence dangerously prejudicial merely because the government fails to prove that its suspicions are founded. It is precisely the danger that its suspicions are groundless that underlies the "clear and convincing" standard. Beechum's case comes squarely within the rule established by *Broadway.*

## IV. The Continued Vitality of *Broadway*

### A. *The Fifth Circuit on* Broadway: *The Current Season*

Although the foundation established by the government for admitting the credit cards into evidence thus fails the test of *Broadway,* it might be suggested that the principles of that case should be confined and their force diluted. The theater may be dying, but *Broadway* retains its vitality. As patrons of the art of evidence we resist any efforts to dim the illumination *Broadway* has cast on the law of this circuit. The government's attempt to confine *Broadway* represents no legitimate stage in the evolution of that law, but rather possesses the narrow appeal of many off-*Broadway* productions. None of our recent cases need give us pause in reaffirming the vitality of *United States v. Broadway.*

In *United States v. Blewitt,* 538 F.2d 1099 (5th Cir. 1976), the defendant was charged with aiding and abetting one Just in the interstate transportation of two forged checks. We held that evidence of five other allegedly forged checks that were identified as belonging to the same payor, filled in

with the unauthorized payee and endorsement, and negotiated during the same time period as the two indictment checks were properly admitted as part of the res gestae despite the fact that it was not clearly shown whether Blewitt or Just had cashed the checks. We distinguished *Broadway,* in which the prosecution's failure to prove that the defendant had cashed the other forged checks precluded the admission of this other crimes evidence, because *Blewitt* concerned only a charge of aiding and abetting. This meant that although the government was obliged to show that the offense had been committed by a principal and that Blewitt aided and abetted that principal, it was not necessary that the principal be identified. *Id.* at 1101, *citing Hendrix v. United States,* 327 F.2d 971 (5th Cir. 1964). Hence it was unnecessary to show the identity of the person who cashed the five other forged checks. The government thus satisfied *Broadway* merely by proving that someone uttered the checks and that those checks were part of a fraudulent scheme that Blewitt aided and abetted.

Far from limiting *Broadway,* then, *Blewitt* extends that case to the offense of aiding and abetting. It is only because the congruent physical elements of the latter crime were easily demonstrated in *Blewitt* that evidence inadmissible against the principal in *Broadway* should prove admissible against one who aids and abets.

No other case in this circuit has seriously impaired the vitality of *Broadway.*[20] To

---

[20] One case that might be thought to cut back on the scope of *Broadway* is *United States v. Maestas,* 546 F.2d 1177 (5th Cir. 1977). In *Maestas* the defendant was charged with causing forged checks to be transported in interstate commerce. The only substantial question at trial was whether a bank teller correctly identified the defendant as the person who cashed a forged check. In order to prove identity, the government introduced evidence of seven other transactions in which cashier's checks identical to those defendant was accused of transporting had been cashed. Although in six of the seven cases there was no direct evidence that the defendant had cashed the other checks, her fingerprints were found on either the check or the deposit slip in five such cases. Moreover, all of the checks were counterfeit and all were made payable to wom-

en, cashed in split-deposit transactions, and transported in interstate commerce for payment. With respect to the one transaction in Denver in which it was unquestioned that defendant cashed a counterfeit check, her identity was clearly established by a photograph taken of her leaving the bank. The Denver police subsequently searched her apartment and discovered a large number of blank checks and identification cards, all of which were counterfeit.

In light of this wealth of circumstantial evidence linking the defendant to the other crimes, it is not surprising that this court held that the evidence was properly admitted. But we did so certain that the defendant had cashed a counterfeit check in one of the Denver

the contrary, we have in five recent cases cited the *Broadway* rule as the law of this circuit. *See United States v. Rice,* 550 F.2d 1364, 1372 (5th Cir. 1977); *United States v. Myers, supra,* 550 F.2d at 1044; *United States v. Levine,* 546 F.2d 658, 699 (5th Cir. 1977); *United States v. Taglione, supra,* 546 F.2d at 199; *United States v. Bloom, supra,* 538 F.2d at 708. In every one of these cases, the Federal Rules of Evidence were fully applicable. Nevertheless, the issue whether the Federal Rules overrule *Broadway* has recently been joined. *See United States v. Brown,* 548 F.2d 1194, 1213–15 (5 Cir.) (Gee, J., dissenting). We turn next to assess the strength of this claim.

### B. *Congress on* Broadway

■ It might be argued that the recent adoption of the Federal Rules of Evidence casts new light on the proper role of *Broadway* in this circuit. Rule 404(b) provides merely that evidence of other crimes, wrongs, or acts may be admissible for specified purposes such as proof of intent. *See* note 4, *supra.* The Federal Rule thus addresses only the question of the permissible purposes for admitting such evidence.

Cataloguing those exceptions has always been only the first and easiest question in considering the admissibility of other crimes evidence. The statute thus merely summarizes prior caselaw regarding the permissible uses for such evidence. It leaves untouched the second and more problematic task of refining criteria, such as the requisite degree of similarity of the prior and charged offenses and the degree of proof required of those ostensibly similar elements, designed to ensure that extrinsic conduct evidence is of probative value for the enumerated purposes in particular cases. The latter project is one for which

there is no authoritative source other than the prior common law. It is a task in which this court has been painstakingly involved for almost ten years. *Broadway* and *San Martin* are the products of that common law evolution. The fruits of this court's careful labors are not lightly to be discarded by implication.

Nevertheless, it might be argued that the legislative history of Rule 404(b) suggests Congress generally favors the admissibility of evidence of other wrongs or acts offered for permissible purposes. To begin with, the House Committee on the Judiciary amended the second sentence of 404(b), which in the version approved by the Supreme Court had begun with the words, "This subdivision does not exclude the evidence when offered . . . ." The amended version of this sentence, which begins with the words "It may, however, be admissible," was substituted to place "greater emphasis on admissibility." *See* H.Rep.No.93–650, 93rd Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News, pp. 7075, 7081.

At best, this portion of the legislative history represents merely the expression of a relative, not an absolute preference. Congress thought the Court's version of 404(b) unsatisfactory insofar as it contained a negative implication that even highly probative other crimes evidence adduced for a permissible purpose might be excluded. At worst, such unelaborated sentiment, completely divorced from the question how intelligently to gauge the probative value of other crimes evidence adduced for a particular purpose, is scarcely a basis for implying the dismemberment of a body of law reflecting this tribunal's deliberations over the subtle and perplexing question at hand.

The remarks of the Senate Committee are no more disabling to the law of this

---

transactions, thus satisfying the *Broadway* test as to that transaction, and that all seven transactions were bound together with the two indictment transactions as involving a common plan or scheme. *See* note 7, *supra.* We specifically distinguished *United States v. Goodwin, supra,* because in that case there was no evidence that the prior incidents were part of the

same scheme as the charged offense. We distinguished *Broadway* as a case involving not identity but intent. Thus *Maestas* applies only to linked other offenses, at least one of which satisfies *Broadway,* that form part of a common scheme or plan including the charged offense and that are introduced to prove identity.

circuit. Concerned that the use of the word "may" in Rule 404(b) in the final version might give the trial judge warrant to exclude evidence on an unprincipled basis, the Senate Committee on the Judiciary reported:

> Although your committee sees no necessity in amending the rule itself, it anticipated that the use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, *i. e.*, prejudice, confusion or waste of time.

S.Rep.No.93–1277, 93d Cong., 2d Sess., *reprinted* in [1974] U.S.Code Cong. & Ad. News, pp. 7051, 7071.

This portion of the legislative history, like the House Committee Report, gives no indication that it is addressed to the viability of judicially developed requirements for the admission of other crimes evidence. It is, rather, addressed solely to the scope of the trial judge's discretion. The statement merely expresses an understandable concern that trial judges not construe the phrase "may . .׀ . be admissible" in 404(b) as impliedly according them unlimited freedom to exclude other crimes evidence adduced for one of the permissible purposes. Although trial judges will continue to have discretion to exclude such other crimes evidence, the decision to do so must be founded on an articulable reason— it cannot be "arbitrary." Furthermore, the articulated reason must correspond to one of the "considerations" enumerated in Rule 403.[21] Since those considerations include such open-ended concepts as "prejudice" and "confusion," there remains in the trial judge broad discretion to exclude other crimes evidence. The function of *Broadway* and *San Martin* is, as we shall see, merely further to confine and guide that discretion.

A third aspect of the legislative history of Rule 404(b) is the pertinent Advisory Committee Note. The Committee declares first that "the rule does not require that [other crimes evidence offered for a permissible purpose] be excluded." This statement of Rule 404(b) avers only that there is no *per se* rule against the admission of other crimes evidence.[22] The Committee goes on to observe that, with respect to excluding other crimes evidence offered for a permissible purpose,

> [t]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decisions of this kind under Rule 403.

The Advisory Note, like the Senate Committee Report, brings the considerations set forth in Rule 403 to bear on the decision to exclude other crimes evidence. But nothing in the legislative history suggests that Congress or the Advisory Committee intended also to import the *standard* for weighing those considerations set forth in Rule 403—i. e., that probativeness must be "substantially outweighed" by prejudice or confusion. Indeed, had it been Congress's intention to rely solely on Rule 403, the Senate Committee Report presumably would have said that the trial might exclude other crimes evidence only "on the basis of Rule 403" rather than "on the basis of those considerations set forth in Rule 403, i. e., prejudice, confusion or waste of time."

Even if Congress did intend to say that the trial judge may exclude other crimes evidence only on the basis of Rule 403 itself, however, *Broadway* would still control this case. To say that other crimes evidence may be excluded only if prejudice *substantially* outweighs probative value simply does not effect such a radical shift in the

---

21. *See* note 5, *supra*.

22. This weak statement of the Rule could be construed to confer, by negative implication,

absolute discretion to exclude other crimes evidence—hence the Senate Committee's justified concern that it not be so interpreted.

law as would sweep before it *Broadway* and *San Martin* and render the law of this circuit an anachronism.

To begin with, the term "substantially outweighs" is susceptible of such variable and subjective application that it is hard to see how it would alter a doctrine such as the *Broadway* rule that leaves unarticulated the precise balance of probative value and prejudice. More fundamentally, the animus behind the *Broadway* rule cannot be other than to prevent the admission of other crimes evidence that exerts a prejudicial effect outweighing its probative value. As we have interpreted and applied *Broadway*, then, that case is entirely consistent with both Rule 404(b) and the legislative purpose the rule was meant to serve.

There is ample authority for the proposition that our pre-Rules cases in general and *Broadway* and *San Martin* in particular guide our application of the Federal Rules of Evidence. In *United States v. Brown, supra,* 548 F.2d at 1206–07, 1206 n.24, we turned to *Broadway* for such guidance in applying Rule 404(b).[23] Similarly, in *United States v. Bloom, supra,* 538 F.2d at 709, we applied Broadway's requirement that the similar physical elements of the prior offense be proved by "plain, clear, and convincing" evidence, though we ultimately sustained the admission of the evidence in that case. Most important, we correctly observed in *Bloom* that Rule 404(b) "coincides with and is further clarified by our prior Fifth Circuit decisions," notably *San Martin* and *Broadway. United States v. Bloom, supra,* 538 F.2d at 708. We shall turn next to investigate the precise manner in which *Broadway* clarifies Rule 404(b).

Rule 404(b) represents an omnibus provision in the sense that it applies to different kinds of prior act evidence and different permissible uses of that evidence. Applying Rule 403 to Rule 404(b) demands drawing certain distinctions among uses and kinds of Rule 404(b) evidence. Determining

the meaning of Rule 403 terms such as "unfair prejudice" in the context of other crimes evidence adduced to prove a defendant's mental state or identity calls for precisely the kind of inquiry envisaged by *Broadway* and *San Martin.* Far from eventuating in the sort of "arbitrary discretion" feared by the Senate Committee, application of these precedents establishes a structured and principled means of determining the admissibility of other crimes evidence. *Broadway* and *San Martin* merely unpack the concepts of prejudice and probative value in an other crimes context, thereby generating several levels of inquiry.

1. Similarity

Determining whether the prior offense is sufficiently similar to generate a valid inference of intent to commit the charged offense is a matter of assessing its probative value. Rule 404(b) does not address the question of similarity at all. Indeed, it does not even use the term. The reason is simply that 404(b) describes some permissible uses of other crimes evidence for which similarity is required (e. g., intent) and some for which the similarity of the prior act is irrelevant (e. g., motive).

Consequently the requirement of similarity and criteria for determining the requisite degree of similarity must be imported into the terms of 404(b) and 403 in the context of other crimes evidence adduced for purposes to which similarity is germane. It would be possible to leave the trial judge without guidelines in this respect—that is, without establishing criteria in virtue of which a prior and charged offense are to be adjudged similar. That, however, would not solve the problem of "arbitrary discretion" and would inevitably lead to different results in like cases. On the other hand, we might establish beforehand the requisite criteria for determining similarity, thereby confining the trial judge's discretion within broad limits and placing both the govern-

---

**23.** The majority relied on *Broadway* as an alternative basis for excluding other crimes not convincingly proved by competent evidence, though we did not decide whether Federal

Rules altered the *Broadway* rule. *But see United States v. Brown, supra,* 548 F.2d at 1213–15 (Gee, J., dissenting).

ment and criminal defendants on notice regarding the kinds of other crimes showings likely to be sufficient. That is precisely what *Broadway* and *San Martin* purport to do.

We are unwilling to read a Congressional committee's concern regarding "arbitrary discretion" as a compelling reason to scrap established criteria for determining similarity, and hence probative value, in favor of the trial judge's unguided calculation in which "similarity" will presumably play a less exclusionary, but correspondingly more unpredictable role.

Under any reasonable standard, moreover, the government failed to demonstrate the requisite degree of similarity between prior and charged offense in the case at bar if it failed to show that the credit cards were stolen.

### 2. Standard of Proof

The probative force of the other crimes evidence in this case rests on the notion that Beechum possessed stolen credit cards. The government, failed to prove convincingly that the cards were stolen. Rule 404(b) by its express terms does not suggest the standard of proof required of other crimes evidence. One reason for this is that the rule covers the spectrum from evidence of prior convictions to evidence of prior acts that are not themselves unlawful; moreover, it covers a broad range of permissible uses for such evidence. Not surprisingly, therefore, the rule leaves open the requisite degree of certainty.

Our pre-Rules cases, notably *Broadway* and *Simmons,* help fill this gap. At least where the prior act is introduced as a prior criminal offense to prove the defendant's mental state, *Broadway* and its progeny supply the "plain, clear and convincing" standard. The trial court is enabled by this standard to assess whether the elements of the prior offense required to establish its similarity to the charged offense have been sufficiently proved, and hence whether the prior offense has significant probative value. When the evidence fails to satisfy the "clear and convincing" standard, the relia-

bility of the already subtle inference from past act to present intent is damaged beyond repair. Given the doubtful probative value of the evidence, coupled with the prejudicial impact necessarily attendant to evidence of prior crimes—even incompletely proved crimes—*Broadway* properly excludes such evidence.

### 3. An Alternative Argument

█ Even assuming, for the sake of argument, that *Broadway* were no longer a *per se* rule, we would reach the same result. That is, assuming that the only ground for excluding other crimes evidence was the Rule 403 balancing test, under the circumstances of this case the trial judge should not have admitted evidence of Beechum's possession of the two credit cards. A case by case determination of probative value versus potential prejudice would call for consideration of the same factors that undergird the *Broadway* test, though we should no longer automatically exclude evidence of other crimes when the requisite similarity to the charged crime was not convincingly demonstrated. Rather, we should weigh the prejudicial impact of the particular extrinsic offense against the probative value of the evidence in light of the totality of the circumstances.

Under such a test it might be argued that although the prosecution did not convincingly demonstrate that the credit cards were stolen, there was nonetheless some evidence from which the jury might conclude that Beechum possessed stolen credit cards. Hence, it might be said, the other crimes evidence had some probative value that was not outweighed by possible prejudicial effect since the danger of unfair prejudice from a case of possessing stolen property is not as great as that occasioned by evidence of more violent crimes, such as *murder or rape.*

Although the danger of prejudice is admittedly less when the prior offense is not one calculated to excite the outrage of the jury, the prejudicial effect of other crimes is not limited to their emotional impact on the jury. The message not only of *Broad-*

*way* but of the great weight of the case law is that evidence of other crimes is inherently prejudicial. *See, e. g., United States v. Myers, supra,* 550 F.2d at 1044. Even when the prior offense is not a violent crime, three elements of prejudice remain.

First, the jury may punish the defendant for the prior rather than the charged offense. Second, the jury may infer from the defendant's assumed guilt of the prior offense that he committed the charged offense. Third, the jury may infer that two incomplete or unproved offenses somehow cumulate to justify some punishment. This, of course, is the danger of bootstrapping, whereby a prosecutor uses an incomplete prior offense and an incomplete charged offense to reinforce each other, each providing the basis of an inference that completes the other.

A necessary counterweight to these dangers is the requirement that the physical elements of the prior offense be convincingly proved. But assuming *Broadway* is no longer a *per se* rule, in some cases the need for other crimes evidence may be so great, and the failure to satisfy those requirements so inconsequential, that the trial court may, in its discretion, admit the evidence. This is not such a case.

In the case at bar the prosecution's failure to show that the credit cards were stolen went to the heart of the ostensible similarity between the prior and charged offenses. The prosecution could so easily have obtained evidence that the addressees had not received the cards, or perhaps that Beechum had used the cards in an unauthorized manner, that its failure to come forward with such proof is entirely unexcused. Certainly any sensible system of balancing prejudice against probative value would take into account the difficulty of buttressing proof of the similar elements of the prior offense. Probative value is hence reduced when the foundation for other crimes evidence is lacking an easily verifiable fact that might resolve substantial doubt whether a similar offense in fact took place.

Moreover, the need for admitting the cards into evidence, was not so pressing that we must overlook the deficiencies of the government's foundation. There was other convincing evidence from which Beechum's unlawful intent could have been inferred. Beechum's story that he intended to turn in the silver dollar to his supervisor was contradicted by two witnesses.

Supervisor Cox testified that he had seen Beechum and Beechum had seen him between 3:30 and 4:00 that afternoon, that indeed Beechum had been "close enough to touch" him, but that Beechum had mentioned nothing about a silver dollar. The postal inspector testified that he arrested Beechum at the end of the work day, while the appellant was standing outside his car in the parking lot with the engine running. The implication was clear that Beechum was preparing to leave, not trying to find his supervisor.

Given the strength of available evidence from which the jury could have inferred intent, the deficiencies of the prosecution's proof of the extrinsic offenses, and the ease with which the information lacking could have been supplied it was error to admit evidence of the extrinsic offenses.

V. Conclusion

In sum, we think that interpreting Rule 404(b) in light of the prior law in this circuit leaves unimpaired the force of *Broadway* as applied to the facts of this case. *Broadway* and its progeny elaborate on the standards for determining probative value and prejudicial impact in the context of other crimes evidence. Those cases fill in the gaps left by the Federal Rules. Applying Rule 404(b) in light of the criteria for similarity, the standards of proof, and the notion of prejudice articulated by the *Broadway* line of cases impels us to the conclusion that the trial judge improperly admitted into evidence the credit cards found on Beechum's person.

A healthy judicial skepticism regarding other crimes evidence is engrained in our jurisprudence. We are loathe to assume, absent a clear indication to the contrary,

that the unelaborated sentiment of the legislative history of Rule 404(b) would eviscerate such a basic axiom when the text of 404(b) plainly does not. We do not believe that the new rules of evidence wrote a new set of commandments on a wholly new slate. As a codification founded on its historical antecedents, the Federal Rules of Evidence shall not be taken to repeal the products of our studied deliberation unless that intention is clearly manifest. The curtain has not fallen on *Broadway,* and its lights yet burn.

The judgment of the district court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

GEE, Circuit Judge, dissenting:

The court's massive opinion struggles to justify retaining various trammels on the receipt of "other crimes" evidence, trammels which some cases in our circuit had imposed before enactment of the Federal Rules of Evidence. Its essential message is that the homogeneous rulings of our court on this subject remain unchanged by this enactment. Since I think that our rulings are in no sense homogeneous, that the court has selected as our future norm the most extreme of our cases—*Broadway*[1]—and that the new rules were intended to change the law in such matters, I write briefly to demonstrate why I think so. And since it seems to me as well that the court has reached a strange and incongruous result in this case, I therefore also respectfully dissent.

### Beechum's Case

For convenient reference, I epitomize the relevant record facts: defendant Beechum's supervisors, it appearing to them that he had on several occasions engaged in "trepidation[2] of the mails," placed a bait letter in one of his collection boxes containing, among other things, a distinctive and heavy coin. When Beechum turned his mail in, the bait letter was found to have been rifled and resealed. Later that afternoon, as Beechum went to his automobile on the parking lot,[3] he was waylaid by a postal inspector. After Beechum had ostensibly turned out his pockets, the inspector searched him and found the unique coin from the bait letter. Also found, in his wallet, were credit cards which Sears, Roebuck and Company had issued and mailed about ten months before to two addressees on routes he had served. It is for the admission of these cards, offered to counter Beechum's defense that the coin got into and remained in his pocket by an unfortunate chain of innocent circumstances and without intent on his part to steal it, that the court reverses his conviction.

It is, of course, almost always necessary to prove intent by circumstantial evidence, and intent was the only real issue in this case. "Other crimes" evidence is a species of circumstantial evidence going to intent. I am satisfied that any reasonable man-on-the-street, unfavored by a legal education, would believe that finding valuable matter mailed to others in the wallet of the mailman, months after it was sent, strongly indicates that the postman is getting into the mails. Nevertheless, the majority holds that in this case such evidence may not be received. A course of reasoning which reaches a result so at variance with common sense seems worth examining.

The court says that proof of the prior crime, to be probative and admissible, must be clear and convincing and that this proof is not clear and convincing because "non-receipt" by the addressees was not proved. Had nonreceipt been shown, the court says, the evidence would have been properly admitted. *Supra* at 500 of 555 F.2d. This plainly does not follow. To see why, one need only consider the sole practical circum-

---

1. *United States v. Broadway,* 477 F.2d 991 (5th Cir. 1973).

2. By this term the witness presumably meant molestation.

3. Whether he was leaving for the day is in question.

stance which proof of nonreceipt would have ruled out: that each of two distinct and different addressees on a route sometimes served by Beechum received his Sears, Roebuck credit card in the mails, opened the envelope, and thereafter either gave his card to Beechum (or to someone else who gave it to Beechum) to carry around in his wallet, or misplaced it where Beechum (or someone who gave it to Beechum) found it. Can it be said that this doubt about Beechum's having extracted the two cards from the mails is a reasonable one? How much more reasonable to believe that Beechum—possessed of both access and motive and caught red-handed with the goods—simply purloined the cards from the mails!

On such evidence as this, a jury would doubtless have been upheld in convicting Beechum of stealing the credit cards themselves, reasonably believing the likelihood that both addressees received their credit cards in the mails and that afterwards each card somehow legitimately found its way back into the mail carrier's wallet too slight to be troubling. Yet the majority concludes that the trial judge could not have determined, in the exercise of his broad discretion to admit or exclude evidence, that absent proof of nonreceipt, Beechum's possession of *two* cards long previously mailed to one of his mail routes was not "clear and convincing" evidence that he purloined them from the mails. I therefore conclude that the majority has wrongly applied even the *Broadway* rule which it claims to follow, holding to be not "clear and convincing" evidence which to the contrary could properly be thought to have put the matter beyond reasonable doubt and, so holding has achieved a result wrong even by its own measure.

In the face of such tortured reasoning, it is small wonder that enforcement of the criminal law proceeds unevenly and uncertainly. And this is serious enough. But even more serious, the majority's treatment of Rule 404 seems to me to be clearly at variance with the congressional purpose in enacting it, so as to perpetuate into the future and for other cases the mischief and confusion which the rule was meant to end.

## Admitting Evidence of Prior Misdeeds: General Considerations

Rule 404 represents an uneasy compromise between two undesirables, neither of which courts have found themselves long able to stomach. The first of these is countenancing proof designed to show merely that the defendant is a bad man generally, a person of bad character, and therefore probably performed the specific bad act with which he is charged. It is not that such evidence is without some probative value. All things being equal, it probably is more likely that one who beats his wife, batters his children and cheats at cards would steal from the mails than that one of better character and behavior would do so. The reason that such evidence is excluded is that it is believed to raise a danger that the jury may convict because the defendant is a bad man who deserves punishment whether or not he is guilty of the crime charged. These considerations are embodied in prior case law, codified in Rule 403, and explained in the Advisory Committee's note appended to it:

### Rule 403.

### EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

\*　　\*　　\*　　\*　　\*　　\*

[Advisory Committee's Note]

The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance. These circumstances entail risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful

than merely wasting time, at the other extreme. Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission. [citations omitted]. The rules which follow in this Article are concrete applications evolved for particular situations. However, they reflect the policies underlying the present rule, which is designed as a guide for the handling of situations for which no specific rules have been formulated.

Exclusion for risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time, all find ample support in the authorities. "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

Courts have dodged with equal vigor, however, the other horn of the dilemma: the view which would exclude *all* evidence of extraneous behavior. Most courts have simply found it too much to swallow to exclude such evidence as the majority says should not have been admitted in this case. For what ensues in this event are arguments whereby the defense undertakes to pound into the jury that there is not a shred of evidence before it that defendant has ever erred before and that he should, therefore, receive the benefit of all doubts, however far fetched. And especially has this been so where such questions as motive or intent are, as here, dispositive.

Pinched between these rocks, courts in the past have compromised. And the classic compromise has taken the form of admitting evidence of *similar* wrongdoings by the defendant, not in order to prove his general bad character,[4] but to show pattern, practice, intent or absence of accident or coincidence. It has been thought worth tolerating the detrimental effect such evidence may have [5] on the jury's general estimate of the defendant as a person in order to avoid the spectacle of having him repre-

sented in argument as a lamb led to the slaughter by a one-time combination of curious but innocent circumstances.

Inside these perimeters, then, the law of "other crimes" evidence has oscillated from court to court and case to case, sometimes leaning more to one extreme and sometimes to the other. And the devices by which the evidentiary gate through which such matter comes in has been edged open or closed have always been the same: the court's requiring greater or lesser similarity between the elements of the prior act and that for with which the defendant is being tried, together with tightening or relaxing the standard of certainty with which the prior act is required to be established. Our court has done so no less than others, and our jurisprudence contains cases leaning first one way and then the other, as I shall later show.

### The Broadway Rule

It is safe to say, however, that *Broadway,* which the majority would lay down from henceforth as a per se rule of decision, and on which it founds its opinion, is probably as hostile to the receipt of such evidence as any that our court has handed down. Both of the restrictive devices noted above are there applied with a vengeance. In *Broadway* the defendant was charged with transporting in interstate commerce a forged or stolen money order. That he had done all the physical acts charged was all too plain, but the defense was that he had not known the order he passed was forged or stolen— want of intent, in fine. His conviction was reversed because, in these circumstances, two other money orders passed about the same time had been allowed in evidence. All three orders, as part of a serially numbered group of four hundred, had been reported missing several weeks before defendant passed the one charged. The two others were, like the one he passed, endorsed to the defendant. All three were

---

**4.** In spite of its tendency to do so, as the majority somewhat confusedly but correctly notes. *Supra* at 494 of 555 F.2d.

**5.** Partially controllable, to one degree or another, by proper jury instructions.

endorsed in the same hand—the defendant's hand, according to expert testimony accepted by the jury. Nevertheless, said the *Broadway* panel, the offense indicated by defendant's possession of the other two orders admitted in evidence was reversibly dissimilar to that with which he was charged because the prosecutor did not establish that Broadway *himself* had cashed the two other money orders or had otherwise placed them in the flow of commerce. The prior offense indicated was, in other words, required to be *identical* in all its physical elements to the crime charged in order to be sufficiently similar to it for receipt in evidence. And for good measure, the opinion laid down that proof of the prior offense must be "plain, clear and conclusive." 477 F.2d at 995. What this last means is probably best evidenced by the majority opinion in this present cause, where evidence which seems to me of such a quality as to have supported a conviction of the prior crime beyond a troubling doubt is held to fail the test. And so the road along which such evidence comes in was, in 1973 and by *Broadway,* so narrowed and mined as to be for practical purposes closed. Yet such evidence continued to come in since, as might have been expected, the *Broadway* rule was by our court sometimes followed, sometimes distinguished and sometimes passed over in silence.

### Our "Homogeneous" Decisions:
### Conflict and Chaos

The majority's opinion labors at length to show that the inadmissibility of these credit cards is but another predetermined step down the clearly marked and homogeneous path of Fifth Circuit authority dealing with prior misbehavior. This is not so. As I read the cases, the road is not clearly marked but branches off in every direction, full of deceptions and detours. Indeed, in the current state of disarray of our case authority there is no way for a district judge to predict whether evidence of a prior wrong-

doing or crime is or is not properly admissible. As one awkward example, possession of credit cards belonging to another by one employed in the postal service was held properly admissible in *United States v. Robertson,* 460 F.2d 1250 (5th Cir. 1972), with only circumstantial proof that the credit cards were stolen. Today the majority holds that almost identical evidence is not admissible. The distinctions urged by it are neither significant nor convincing and certainly offer no guide to a district judge as to whether to admit evidence of unexplained credit cards found on the person of a defendant accused of stealing from the mails. *Robertson* is, in fact, simply brushed aside.

In *United States v. Park* this court reversed a conviction for theft of a television because of improper cross-examination about defendant's possession of other stolen merchandise. In doing so the court made the following sweeping statement: "[It is] the well established rule in this circuit that 'a witness may not be impeached by inquiry about specific acts of misconduct not resulting in conviction.'" 525 F.2d 1279, 1284 (5th Cir. 1976). And yet as recently as *Bloom v. United States* this court found no error in repeated testimonial reference to a defendant's previous unindicted trafficking in other drugs distinct from the offense charged. 538 F.2d 704 (5th Cir. 1976). *Accord United States v. Pollard,* 509 F.2d 601 (5th Cir. 1975) (no proof of conviction is required before introducing evidence of subsequent acts).

Finally, as evidence of the bewilderment the *Broadway* rule has wrought in our circuit, I would point to the case of *United States v. Blewitt,* 538 F.2d 1099 (5th Cir. 1976), where five forged checks were admitted into evidence without proof that the checks had been cashed, a seeming repudiation of *Broadway* itself.[6] The majority's elaborate construct resulting from *San Martin*'s[7] so-called "thresholds," coupled with *Broadway*'s requirement of similar

---

**6.** The panel distinguished *Broadway* on the ground that the charge of aiding and abetting in *United States v. Blewitt* made the proof that the forged checks had been cashed irrelevant.

**7.** 505 F.2d 918 (5th Cir. 1974).

physical elements, offers neither guidance nor predictive value to trial courts. Believing that the new Federal Rules of Evidence offer us an opportunity to extricate ourselves from our own quagmire of contradictory directives, I would take this opportunity to draw a new blueprint for the admissibility of prior wrongdoings, relying on the principles set forth in the rules themselves.

### The New Rule 404

For mercifully, across this tangled and conflicting mass of authority, in 1975 fell Rule 404 and with it a golden opportunity to bring order out of the chaos. Simple and direct, the rule both describes clearly what sort of "prior crimes" evidence is admissible and lays down the test by which its admission or exclusion is to be determined. The pertinent portion of Rule 404 is section (b):

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Elided to remove its prohibition against general character blackening, then, the rule lays down the following standard for admission of such evidence as the credit cards found on Beechum:

> Evidence of other crimes, wrongs or acts . . . may . . . be admissible . . . for . . . purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

One searches this language in vain for such niceties and "thresholds" as the majority would require: proof of identity of every

8. Indeed, under Rule 404 the prior misdeed need not even have been a crime at all, merely an "act"; and surely Broadway's "act" of forging other purloined money orders was probative, whether he had personally put them into commerce or not.

9. The Report of the House Committee on the Judiciary states:

technical, physical element of the prior crime to that of the offense charged,[8] "plain, clear and conclusive" evidence of it, and the like. These elaborate controls upon the admission of such evidence are—quite simply—abandoned by the new formulation, a formulation proposed by the Supreme Court and adopted with one minor change by Congress—a change intended, ironically enough in view of today's result, to militate for and not against admission of such evidence.[9]

It does not follow, however, that Congress and the Court intended there be *no* controls. Refusing to embrace such exquisite and mechanical appellate exclusionary devices as the majority applies here, the rulemakers adopted a different and more flexible standard. It will be recalled that Rule 404(b) does not provide that evidence such as this *is* admissible, only that it "may be." Nor are we left in doubt what test is to determine whether it may or may not come in: it is the discretion of the *trial* judge, guided by the "unfair prejudice or delay vs. probative value" balancing test of Rule 403. The Advisory Committee says so:

> No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind *under Rule 403.*

So does the House Committee on the Judiciary:

> Although your committee sees no necessity in amending the rule itself, it anticipates that the use of the discretionary word "may" with respect to the admissibility of evidence of crimes, wrongs, or acts is not intended to confer any arbi-

The second sentence of Rule 404(b) as submitted to the Congress began with the words "This subdivision does not exclude the evidence when offered". The Committee amended this language to read "It may, however, be admissible", the words used in the 1971 Advisory Committee draft, on the ground that this formulation *properly placed greater emphasis on admissibility than did the final Court version.* (emphasis supplied).

trary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for such evidence, *the trial judge may exclude it only on the basis of those considerations set forth in Rule 403, i. e. prejudice, confusion or waste of time.* (emphasis added).

It is thus to be the *trial* judge, applying Rule 403's balancing test and bearing in mind Rule 401's definition of relevant evidence ("evidence having any tendency to make the existence of any fact . . . of consequence . . . more probable or less probable than it would be without the evidence") and Rule 402's command to admit *all* relevant evidence unless the Constitution, statute or rule forbids it, who admits or excludes such evidence. He is to do so in the exercise of a broad discretion, one which we review only for abuse. *United States v. Madrid,* 510 F.2d 554 (5th Cir. 1975). This is the plan and command of Congress and the Supreme Court.

### The Sinking Ship Opens Fire on its Rescuers

But it is not the plan applied by the majority. In place of the above rule of presumptive *admission* of such evidence, laid down by the Supreme Court and enacted by the Congress, the majority institutes its exact contrary by resurrecting *Broadway*'s rule of presumptive *exclusion* : "We start with the general rule which is of course that evidence which shows or tends to show commission of crimes not charged is inadmissible in a trial for a particular crime." 477 F.2d at 994. And having commenced by turning Congress' basic scheme of treating such evidence inside out, it then proceeds, by the engraftment on Rule 404 of mechanical "thresholds" (*supra* at 492 of 555 F.2d) of our own prior devising, thresholds through which the district court must first screen such evidence before he may admit or exclude it, to substitute *our* rulemaking power and *our* discretion for that of Congress and the Supreme Court. In so doing it produces such quixotic results as have occurred here and, by engrafting its own notions onto Congress' simple plan, de-

ranges it and insures that evidence clearly admissible under Rule 404 will be excluded in the Fifth Circuit. Since I think it would be better if we did as we are told by those who have a right to tell us, I dissent.