UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph TAGLIONE, Jr.,
Defendant-Appellant.

No. 76–2257.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1977.

Theodore J. Sakowitz, Fed. Public Defender (Court-Appointed not under Act), Michael J. Rosen, Asst. Fed. Public Defender, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Michael P. Sullivan, William R. Northcutt, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

COLEMAN, Circuit Judge:

## I. FACTS

Appellant, Joseph Taglione, Jr., was convicted of unlawfully and wilfully committing extortion, which extortion did obstruct, delay and affect commerce and the movement of articles and commodities in com-

merce, in violation of Title 18, U.S.C., § 1951.[1] The relevant facts are as follows: On March 1, 1975, Shell Oil Company shipped a box of D–16 credit card invoices[2] totalling $78,000 from its distribution plant in Zionsville, Indiana, to its credit card center in Tulsa, Oklahoma, via transport truck and air carrier.

These invoices never reached the Tulsa Center. Instead, the box containing the invoices, along with two boxes containing live worms, was found by appellant and two friends[3] lying on the side of the road in the snow at the Indianapolis airport. The boxes containing the worms were stamped "Allegheny Airlines" and were returned to that airline. The box containing the invoices was stamped only "Shell Oil Co., Credit Card Center, Tulsa, Okla." This box contained four smaller cartons which were divided between the three men, placed in their luggage and taken to Fort Lauderdale, Florida. Taglione testified that he felt this was necessary to protect the property since the weather would probably have destroyed them if left on the ground.

On Monday, March 3, Al Hogan, credit manager for the Tulsa Center, received a phone call on Shell's toll free number from Taglione, posing as one John Tumarco.[4] The caller indicated that he represented a client who had found $100,000 worth of Shell invoices which he would release to Shell for a finder's fee of $25,000. Hogan responded that $25,000 was too high since Shell could probably restore most of the invoices through the dealer-held copies. He indicated, however, that Shell might consider a slight reward. At no time did Hogan tell Taglione that Shell would not consider a negotiated reward.

Hogan testified that he asked for the invoices gratuitously but Taglione refused, indicating that he would destroy them if the fee was not paid. The appellant did not recall Hogan demanding their return without a finder's fee but admitted he did "offer" to destroy the invoices if Shell could

---

1. § 1951. *Interference with commerce by threats or violence*

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

 (b) As used in this section—

 (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

 (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

 (c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45.

2. The D–16 invoice is a *Shell Oil Company* credit card invoice filled out in triplicate when a customer charges merchandise purchased from a service station dealer. The original is given to the customer; the dealer retains the tissue copy; and the hard copy (the D–16 invoice) is used by the dealer in lieu of cash to pay Shell for supplies furnished by Shell to the dealer. The Zionsville plant receives the hard copies from its distribution area, processes them, and forwards them to the Tulsa Center for billing.

3. These were co-defendants Tom Schlaebitz and Richard D'Andrea who were acquitted in the first trial of this case.

4. Later identified as the appellant, Joseph Taglione. Taglione testified that the purpose in changing his name was to attract attention. This was also the reason for saying he represented a client, when in actuality he represented himself.

reconstruct them and they were actually worthless.

A second phone call on March 3 by Taglione, still posing as Tumarco, was received by Jack Hall, manager of the Accounting & Services Department at the Tulsa Center. Taglione gave a description of the invoices he was holding and a March 4 call was arranged. At that time, a further detailed description of the invoices was given, to satisfy Shell that these were the missing invoices. A meeting was also arranged the next day for the supposed Tumarco to meet with Bill Edwards, a corporate security representative for Shell Oil Company, to check the authenticity of the invoices. Concerning the reward, Hall said he would have a figure by that time. This conversation was taped and played to the jury.

The March 4 meeting of Edwards and Taglione at the Shell Oil Port Everglades office in Fort Lauderdale was also taped and played to the jury. That tape exposed the appellant, using the name of John Tumarco, acting as business manager for an undisclosed party, negotiating for a reward or finder's fee of 25% of the worth of the invoices, about $19,000. A meeting for March 6 was arranged for the transfer of the invoices and the $19,000.

Edwards and Taglione met on March 6 at the Central Bank of North Dade at the suggestion of Taglione, since, as he testified, cash would be involved and he had dealt at this bank for seven years. This meeting was also taped. The tape revealed that Taglione offered to put the money in a safety deposit box and requested a letter of appreciation indicating the amount of the reward. He also requested a polygraph test to prove that the invoices were not stolen. Taglione hesitated in producing the invoices, at one point driving off and then returning; further negotiations for the requested amount were held and Taglione finally produced the invoices and was arrested.

On February 2, 1975, Taglione, Thomas Schlaebitz, and Richard D'Andrea were tried on a 3-count indictment charging all three defendants with conspiracy to obstruct, delay and affect commerce and the movement of articles and commodities by extortion in that the defendants conspired to obtain approximately $20,000 from Shell Oil Company with the consent of Shell Oil being induced by the wrongful use of the fear of financial and economic injury in that the defendants would withhold from Shell Oil a shipment of Shell credit card invoices unless and until Shell paid the $20,-000. A second count charged the three defendants with actual commission of the crime.

Defendants Schlaebitz and D'Andrea were acquitted of both counts on February 5, 1976. The jury was unable to reach a verdict as to Taglione on either count and a mistrial was declared.

On April 22, 1976, the second trial commenced against Taglione. Because both alleged co-conspirators had been acquitted the conspiracy count was dismissed. On April 23, the jury returned a verdict of guilty on the remaining count and appellant was sentenced to 12 years.

The conviction is now vigorously attacked on several points.

█ First, it is said that the Court erred in denying appellant's motion for mistrial based upon the prosecutor's comments in closing argument concerning appellant's prior record on a marijuana conviction. We find no merit in this argument since the evidence had been brought out in cross examination of the defendant and counsel had ample opportunity for an effort to rehabilitate in his own closing remarks.

## II. JURY INSTRUCTION

On the ground that it denied him the right of having his defense submitted to the jury, appellant challenges the trial court's charge to the jury on the rights of a finder of lost property. The Judge instructed the jury that:

"[T]he finder of a lost property is not entitled to the property as against the true owner. The finder of goods is entitled to recover from the owner only the

necessary and reasonable expenses incurred in the successful recovery and preservation of the goods.

"It is the duty of a finder of lost goods to return them to the owner if he is known and, if the owner is unknown, to follow the reasonable procedures for discovering the true owner."

Appellant's objection is that the use of the word "only" led the jury to believe that as a matter of law the appellant could not bargain for or request a reward. Appellant's defense,[5] not mentioned in the charge, was that his dealings with Shell were merely negotiations for a reward or a finder's fee.

■ The trial court's charge to the jury is a correct statement of the law as far as it goes. *See* 1 Am.Jur.2d *Abandoned, Lost, Etc. Property* §§ 19 and 28; 36A C.J.S. *Finding Lost Goods* § 4. A finder is entitled *as a matter of law* only to his expenses. However, it does not follow that it is a criminal offense to ask for more, as long as the request is not accompanied by extortionate conduct.

■ There was evidence in the record, which, if credited by the jury, could have supported Taglione's defense. The substance of the defendant's theory should have been submitted. There was no evidence that Shell made an absolute demand for the return of the invoices, with no reward or expenses to be paid rendering Taglione's continued possession of the invoices unlawful *per se*. The evidence showed that Taglione offered the return of the invoices in exchange for 25% of the worth of the invoices. Shell never rebuffed Taglione's negotiations. To the contrary, it joined in the bargaining as to the amount of a "finder's" fee. Hogan spoke of the possibility of a slight reward; Hall told Taglione that Shell would give him a figure at his first meeting with Edwards; Edwards stated that for such a sum he would have to consult a higher-up and asked if Taglione

wanted cash. All this does not raise an open and shut defense, but it does raise a theory of defense which the defendant was entitled to have considered.

■ Where the evidence presents a theory of defense for which there is foundation in the evidence, refusal to charge on that defense is reversible error. *Strauss v. United States*, 5 Cir. 1967, 376 F.2d 416, 419. In *United States v. Megna*, 5 Cir. 1971, 450 F.2d 511, we said:

Nearly fifty years ago the Circuit Court of Appeals for the Fifth Circuit laid down the rule that "Where the evidence presents a theory of defense, and the court's attention is particularly directed to it, it is reversible error for the court to refuse to make any charge on such theory". . . .

450 F.2d at 513.

As we said in *Strauss, supra* :

We find no requirement that a requested charge encompass, in the trial judge's eyes, a believable or sensible defense. The judge is the law-giver. He decides whether the facts constituting the defense framed by the proposed charge, if believed by the jury, are legally sufficient to render the accused innocent. The jury is the fact-finder.

\* \* \* \* \* \*

The jury did not have to believe the defenses, but it should have been given the opportunity.

376 F.2d at 419.

Although Taglione is entitled to a new trial on the foregoing ground, we should discuss appellant's other points of error which may arise if the case is tried for a third time.

## III. EVIDENCE OF A SUBSEQUENT SIMILAR OFFENSE

On the issue of Taglione's intent to commit the crime of extortion, the government

5. Appellant requested and was refused the following jury instruction:

It is the defendant, Joseph Taglione's theory of the case that he was acting merely to seek a reward for his finding of the lost Shell invoices; and that his dealings with Shell Oil were negotiations and not absolute demands.

moved, prior to the second trial, to admit evidence of a subsequent similar offense, possession for sale of stolen property. The Court granted this motion and the following evidence was admitted.

In April of 1975 the Florida Department of Criminal Law Enforcement was investigating the apparent robbery of three paintings from a Sarasota, Florida home. Special Agent John Van Tronk initiated contact with one Don Ogles for the undercover sale of the three paintings. Ogles met with Van Tronk in Sarasota on May 27 with two of the paintings, and again on May 28 for the transfer of the third painting. At that time, Taglione, along with one Dennis Record, appeared with the third painting in Taglione's car. As Van Tronk left to close the deal with Ogles, Taglione and Record were arrested and charged with the theft. All charges were later dropped. Taglione testified that he was only transporting the painting to Sarasota for his friend, Record, who needed a ride due to car trouble.

■ The federal courts recognize as a cardinal principle of the common law that evidence of the commission of a wholly separate and independent crime is inadmissible as part of the case against the defendant. See *Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The reason for this rule is, of course, that the guilt or innocence of the accused should be established by the evidence relevant to the alleged offense being tried, not because the jury may believe the defendant to be a person of bad character or because he committed a similar offense. However, the courts have carved out a number of exceptions to this rule; one of which is that evidence of other offenses is

admissible to show criminal intent. *See* Federal Rules of Evidence, Rule 404(b).[6]

■ Before an exception to the general rule may be invoked, the trial court must be satisfied that several prerequisites have been met: (1) there is plain, clear and convincing evidence of a prior similar offense, (2) the prior offense is not too remote in time, (3) intent is a material issue in the instant case, and (4) there is substantial need for the probative value of the evidence. *United States v. San Martin*, 5 Cir. 1974, 505 F.2d 918, 921–22. The danger of the prejudicial effect of similar offenses is such that all of these prerequisites must be met before being admitted into evidence. *San Martin*, 505 F.2d at 923.

■ The evidence in this case clearly does not meet the above standards. It is enough to say that the evidence of the "Sarasota incident" is not evidence of another crime by Taglione. The charges against him were dropped. The admission of this evidence results, in effect, in trying Taglione simultaneously for two crimes, for one of which he was never indicted.

■ Had Taglione been convicted in the "Sarasota incident", as applied to extortion we see no probative value in a conviction for possession of stolen property. The government urges vigorously that the crime appellant committed is in substance the knowing possession and interstate transportation of stolen property, but this is *not* a stolen property case. The indictment alleges extortion, i. e. obtaining property from another with his consent, induced by threat, and contains no mention of stolen property. In addition, both parties entered into a stipulation that the box containing the invoices accidentally fell from the carrier and was accidentally found by Taglione.[7]

---

6. Federal Rules of Evidence, Rule 404:

*(b) Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

7. The following stipulation was entered into by both parties:

On March 1, 1975, a box containing numerous Shell Oil Company credit card invoices arrived at the REA express shed at the Weir Cook Airport at Indianapolis, Indiana.

They were picked up by Allegheny Airlines freight handler named Ted Stevenson who placed them on his truck, delivering them to an Allegheny flight leaving for Tulsa, Oklahoma.

As we said in *United States v. Goodwin*, 5 Cir. 1974, 492 F.2d 1141:

> This Court has never hesitated to approve the admission of other-crimes evidence when that evidence has been relevant under one of the exceptions to the general rule. We have recognized, however, and we must continue to recognize, that the various categories of exceptions —intent, design or plan, identity, etc.— are not magic passwords whose mere incantation will open wide the courtroom doors to whatever evidence may be offered in their names. To the contrary, each exception has been carefully carved out of the general rule to serve a limited judicial and prosecutorial purpose.
>
> 492 F.2d at 1155.

Since evidence of the "Sarasota incident" should not have been admitted, we do not reach appellant's allegation that the trial court abused its discretion in denying appellant's motion for a continuance to allow for the testimony of Dennis Record concerning Taglione's innocence in that theft.

## IV. EXCLUSION OF TESTIMONY OF RAY SANDSTROME

Appellant also attacks as error the trial court's exclusion of the testimony of Ray Sandstrome, Esq. The purpose of Sandstrome's testimony was to introduce a telephone conversation between Sandstrome and Taglione which occurred during the course of the alleged crime and which was probative of Taglione's state of mind.

In a proffer of Sandstrome's testimony out of the presence of the jury, Sandstrome said that he had represented Taglione in an unrelated civil matter in the past and also briefly in the present case. As to the phone conversation, he indicated that Taglione had called him early in March, 1975, and had told him that he and two friends had found several boxes, one containing "Shell credit card receipt stubs". The boxes had been found along the roadway at the Indianapolis airport, and two of the boxes, containing worms, were returned to the airline company marked on the box. The Shell carton was not returned because it had no markings on it but was taken to Fort Lauderdale. Taglione further stated that he had contacted Shell about the invoices being in his possession and that he had used a false name.

Although no specific percentage was discussed, Taglione asked Sandstrome "if he could negotiate for a reward" from Shell, to which Sandstrome answered yes, as long as he did not "hold anyone up" in the negotiation. During a second conversation Sandstrome testified that Taglione asked if there was anything wrong in accepting a reward.

Sandstrome also testified that Taglione said that a Shell representative had informed him that the invoices were worthless and that Taglione had responded that he would accordingly throw them away. At no time did Taglione mention that he had refused to give up the invoices without a finder's fee.

The Court excluded this testimony on the grounds that: (1) a full and complete disclosure was not made to counsel at the time the question was asked, i. e., that he, Taglione, had threatened to destroy the invoices if no reward was paid; and (2) that the conversation had taken place after Taglione had taken affirmative action and could not indicate his intentions at an earli-

---

Sometime during the delivery, the box containing the invoices accidentally fell off the truck along with two other boxes containing worms.
Mr. Joseph Taglioni and his friends, Thomas Schlaebitz and Richard D'Andrea, were at the Weir Cook Airport to fly back to Fort Lauderdale, Florida.
They had flown to Indiana from Fort Lauderdale, Florida, on business which was totally unrelated to this case.

Mr. Taglioni, Schlaebitz and D'Andrea accidently found the box containing the credit card invoices and two boxes of worms lying alongside of the road of Weir Cook Airport. They returned the boxes of worms to the Allegheny Airlines freight shed. They returned to Fort Lauderdale on the Delta Airlines flight with the Shell invoices. (R. 108–109).

er time. We disagree that these reasons are sufficient to exclude the evidence in this case. These factors go to the weight of the evidence rather than to its admissibility.

 Sandstrome's testimony was relevant under Rule 401 of the Fed.Rules of Evidence [8] and he was certainly a competent witness under Rule 601.[9] His statements as to what Taglione said are admissible under Rule 803(3) [10] as a statement of the appellant's then existing state of mind. It is only when the defendant is asserting reliance on advice of counsel as a defense that he must make a full and good faith disclosure before the evidence is admissible. See *United States v. Thaggard*, 5 Cir. 1973, 477 F.2d 626, 636, *cert. den.*, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469.

The judgment of the trial court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

**8.** Federal Rules of Evidence
 Rule 401. *Definition of "Relevant Evidence"*
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**9.** Federal Rules of Evidence
 Rule 601. *General Rule of Competency*
 Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.
 The Advisory Committee Note to Rule 601 states that all grounds of incompetency are eliminated except those specifically recognized in Article VI of the Fed.Rules of Evidence. For our purpose, this means that a lawyer is not prohibited from testifying as a lay witness to a conversation with the accused which shows the state of mind of the accused.

**10.** Federal Rules of Evidence, Rule 803, Hearsay Exceptions
 (3) *Then existing mental, emotional, or physical condition.*—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.