**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert L. LIPPNER, Jr. and James Buddy Williams, Defendants-Appellants.**

**No. 81-7414.**

United States Court of Appeals, Eleventh Circuit.

April 29, 1982.

---

\* Judge Hatchett is recused and did not participate in this decision.

Mark J. Kadish, Atlanta, Ga., for defendant-appellant.

Milton E. Grusmark, Sheryl L. Javits, Miami, Fla., for Williams.

Joseph A. Newman, Melissa S. Mundell, Asst. U. S. Attys., Savannah, Ga., for plaintiff-appellee.

Before TUTTLE, KRAVITCH and JOHNSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellants Robert L. Lippner, Jr. and James Buddy Williams were convicted by a jury of conspiracy to possess with intent to distribute a controlled substance, methaqualone, in violation of 21 U.S.C. §§ 841(a)(1) and 846. On appeal they object to several evidentiary rulings by the trial court, and contend that their enhanced sentences and the regulation scheduling methaqualone as a controlled substance were illegal. Appellant Williams, in addition, asserts that the trial court improperly denied him a severance, and failed to properly charge the jury on his asserted defense; that a fatal variance between the indictment and proof at trial compels acquittal; and that the evidence was insufficient to sustain his conviction. We reject all appellants' contentions except their challenge to their sentences and accordingly

affirm the convictions but remand for proper sentencing.

## I. Background

The evidence at trial showed that in the fall of 1980 Lippner and Robert Jackson Tedder[1] agreed to smuggle marijuana into the United States. The two men acquired a plane, and through various sources Tedder contacted Robert Johannesen, a Drug Enforcement Administration [DEA] agent posing as a potential pilot for drug smuggling operations, about being a pilot for their operation.

In November, 1980, Tedder flew to Atlanta for a meeting with Johannesen to discuss the marijuana smuggling. Johannesen told Tedder that he had a quantity of "quaaludes" (methaqualone tablets) for sale and was looking for a buyer. Subsequently Tedder arranged for Johannesen to sell the quaaludes to customers in Savannah, Georgia.

On November 18 Tedder and Lippner flew to Miami, picking up codefendant James E. Paulk en route. That night Lippner, Paulk, and Tedder flew to Savannah and checked in to rooms at the Holiday Inn previously reserved by Tedder in Lippner's name. At about 7:00 a. m. on November 19, Tedder went to Paulk's room to borrow some shaving items and met appellant Williams and Leonard DeWitt Mills. Paulk introduced Williams and Mills to Tedder and said they would be "the persons that [Tedder] would be introducing to [Tedder's] people."[2]

Subsequently, Mills drove Tedder to the Master Hosts Inn so that Tedder could arrange a meeting with Johannesen. Mills returned to the Holiday Inn. After contacting Johannesen, Tedder called Paulk at the Holiday Inn and told him to bring Williams and Mills over to the Master Hosts so Tedder could introduce the two men to Johannesen. After Paulk, Williams, and Mills arrived at the Master Hosts and Tedder introduced Williams to Johannesen, Tedder and Paulk left for the airport.

Williams and Johannesen then met DEA agent Sprague and in a tape-recorded conversation, the three men discussed the drug transaction in detail. After some discussion of price, Williams led Johannesen to a car in the parking lot and showed him a grocery bag filled with cash.[3] When the two men returned to the motel, the agents arrested Williams. A search of Williams' person revealed a pair of brass knuckles, and a search of the car uncovered a loaded .38 caliber pistol.

County law enforcement personnel, meanwhile, followed Paulk and Tedder after they departed the Holiday Inn. The two men met Lippner at the airport, and prior to departure all three were arrested by a DEA agent. Subsequently, Tedder pleaded guilty to the conspiracy charges and testified for the government at the trial of Lippner, Williams and Paulk.[4]

## II. The Challenge to the Indictment

Both Lippner and Williams assert that the indictment should have been dismissed because no authority existed for the DEA to classify methaqualone as a controlled substance.[5] Appellants argue that the DEA's authority to designate controlled

---

1. Tedder pleaded guilty to the drug conspiracy charges and testified for the government at trial.

2. At trial Tedder testified that he understood the reference to his "people" to mean agent Johannesen.

3. The bag contained approximately $118,000.

4. The government dismissed the charges against Mills prior to trial. The three remaining defendants were convicted but the trial court granted Paulk's post-verdict motion for acquittal. This grant of acquittal is the subject of a separate appeal to this court, *United States v. Paulk*, 677 F.2d 116 (11th Cir., 1982).

5. The legality of the scheduling of methaqualone as a controlled substance was also attacked in *United States v. Gordon*, 580 F.2d 827 (5th Cir. 1978). In *Gordon* the appellants asserted that the delegation of scheduling authority to the Attorney General violated the doctrine of separation of powers and that the scheduling standards provided in 21 U.S.C. § 811 and 812 were unconstitutionally vague. The former Fifth Circuit rejected their challenges, but neither *Gordon* nor any subsequent Fifth or Eleventh Circuit case has addressed

substances was delegated to the DEA from the Attorney General by President Nixon's Executive Order No. 11727, 38 Fed.Reg. 18357. According to appellants, the order was based on the President's authority under 5 U.S.C. § 5317, and that section permits delegation of the authority of a cabinet-level position only when the cabinet position is filled by a new appointment. Because the delegation in question did not accompany a new appointment to the office of Attorney General, appellants continue, the delegation was illegal.

■ We find this argument meritless because it rests on an incorrect interpretation

of the orders involved. Executive Order No. 11727 did not delegate to the DEA the authority to schedule controlled substances.[6] Rather, that order effectuated a reorganization of the parts of the executive branch dealing with drug enforcement and gave the Attorney General supervisory powers over the new drug enforcement machinery. Neither the Order,[7] nor the reorganization plan it refers to,[8] ever mentions the delegation of any powers to the DEA except in section 6 of the reorganization plan which states:

The Attorney General may from time to time make such provisions as he shall

whether the delegation *from the Attorney General to the DEA* was legal.

6. Appellants rely on the statement by the court in *United States v. Gordon*, 580 F.2d 827, 838 (5th Cir. 1978) that the delegation of scheduling authority "was transferred to the DEA pursuant to Executive Order No. 11727" for the proposition that the Executive Order was the instrument which accomplished the delegation. This reliance is misplaced. The *Gordon* court was absolutely correct in stating that the delegation occurred *pursuant to* Executive Order 11727, in the sense that the delegation carried out the substance of President Nixon's reorganization of the drug law enforcement machinery. As the text illustrates, however, the actual transfer of authority from the Attorney General to the DEA resulted from an order by the Attorney General on July 10, 1973, not from Executive Order 11727.

7. Executive Order 11727 stated:
Drug Law Enforcement
Reorganization Plan No. 2 of 1973, which becomes effective on July 1, 1973, among other things establishes a Drug Enforcement Administration in the Department of Justice. In my message to the Congress transmitting that plan, I stated that all functions of the Office for Drug Abuse Law Enforcement (established pursuant to Executive Order No. 11641 of January 18, 1972) and the Office of National Narcotics Intelligence (established pursuant to Executive Order No. 11676 of July 17, 1972) would, together with other related functions, be merged in the new Drug Enforcement Administration.
NOW, THEREFORE, by virtue of the authority vested in me by the Constitution and laws of the United States, including section 5317 of title 5 of the United States Code, as amended, it is hereby ordered as follows:
Section 1: The Attorney General, to the extent permitted by law, is authorized to coordinate all activities of executive branch de-

partments and agencies which are directly related to the enforcement of laws respecting narcotics and dangerous drugs. Each department and agency of the Federal Government shall, upon request and to the extent permitted by law, assist the Attorney General in the performance of functions assigned to him pursuant to this order, and the Attorney General may, in carrying out those functions, utilize the services of any other agencies, Federal and State, as may be available and appropriate.
Sec. 2. Executive Order No. 11641 of January 28, 1972, is revoked and the Attorney General shall provide for the reassignment of the functions of the Office for Drug Abuse Law Enforcement and for the abolishment of that Office.
Sec. 3. Executive Order No. 11676 of July 27, 1972, is hereby revoked and the Attorney General shall provide for the reassignment of the functions of the Office of National Narcotics Intelligence and for the abolishment of that Office.
Sec. 4. Section 1 of Executive Order No. 11708 of March 23, 1973, as amended, placing certain positions in level IV of the Executive Schedule is hereby further amended by deleting—
(1) "(6) Director, Office for Drug Abuse Law Enforcement, Department of Justice,"; and
(2) "(7) Director, Office of National Narcotics Intelligence, Department of Justice."
Sec. 5. The Attorney General shall provide for the winding up of the affairs of the two offices and for the reassignment of their functions.
Sec. 6. This order shall be effective as of July 1, 1973.

8. This plan was Reorganization Plan No. 2 of 1973, 38 Fed.Reg. 15932, 87 Stat. 1091 (1973), *reprinted in* 5 U.S.C. app. II at 137 (1981 Supp.).

deem appropriate authorizing the performance of any of the functions transferred to him by the provisions of this Reorganization Plan by any officer, employee, or agency of the Department of Justice.

■ Contrary to appellants' arguments, the delegation of the Attorney General's authority to schedule controlled drugs occurred by an order of the Attorney General on July 10, 1973, 28 C.F.R. § 0.100, which delegated to the DEA "functions vested in the Attorney General by the Comprehensive Drug Abuse and Control Act of 1970 [Pub. L.No. 91–513, 84 Stat. 1242]." These delegated functions included the Attorney General's authority to schedule controlled drugs pursuant to 21 U.S.C. § 811. This delegation, moreover, was within the scope of permissible delegation set by Congress in 1966, well before Executive Order 11727. *See* 28 U.S.C. § 510.[9] Consequently, we reject appellants' argument that the indictment in this case was improper.

### III. The Evidentiary Rulings

*A. Admission of Prejudicial Evidence*

#### 1. Lippner's Prior Conviction

■ Appellant Lippner contends that the trial court erroneously admitted into evidence his prior conviction for conspiracy to import marijuana as evidence of intent. Lippner asserts that the conviction was not probative of intent and, even if it were, the conviction should have been excluded under Fed.R.Evid. 403 because its probative value was substantially outweighed by the danger of unfair prejudice resulting from its admission.

We find this argument without merit. Fed.R.Evid. 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may,

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This court recently reviewed the requirements for admitting evidence of extrinsic acts under this rule. In *United States v. Mitchell*, 666 F.2d 1385 (11th Cir. 1981) we observed:

The decision of the former Fifth Circuit in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), governs the propriety of the admission of such extrinsic offense evidence. *See Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). First, the evidence must be relevant to an issue other than the defendant's character. Second, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must be otherwise admissible under Rule 403. *United States v. Beechum*, 582 F.2d at 911.

*Mitchell, supra*, 666 F.2d at 1389 (footnote omitted).

The *Mitchell* court further noted that the first prong of the *Beechum* test is satisfied "if the evidence goes to the defendant's intent, the extrinsic offense requires the same intent as the charged offense, and the jury could find that the defendant committed the extrinsic offense." *Id.* at 1389 (citing *Beechum, supra*, 582 F.2d at 913). We conclude, as did the trial court, that this first prong of admissibility is satisfied in this case. Both charges dealt with conspiracies to violate the drug laws and therefore involved the same conspiratorial intent. There is little question, moreover, that a jury would be entitled to find from the prior conviction that Lippner did commit the extrinsic offense.

The second prong of *Beechum*, evaluating the admissibility of the extrinsic offense

**9.** 28 U.S.C. § 510 states:

Delegation of authority

The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General.

under Rule 403, requires considering the strength of the government's case on the intent issue, the degree of similarity between the extrinsic and charged offenses, the amount of time separating the extrinsic and charged offenses, and the likelihood the defendant would contest the issue of intent. *Mitchell, supra,* 666 F.2d at 1390 (citing *Beechum, supra,* 582 F.2d at 913). In evaluating these admissibility issues, the trial judge has wide discretion, reviewable only for abuse. *Id.* at 1390.

We find no abuse of discretion here. Not only were the extrinsic and charged offenses both drug conspiracies, these prior convictions occurred barely two months prior to the trial in this case. Although Lippner asserts that the government's case on intent was extraordinarily strong, given the testimony of coconspirator Tedder for the government, the fact Tedder was involved in the crimes charged and was subject to impeachment necessitated corroborative evidence of intent. Finally, the trial court specifically gave Lippner an opportunity to waive contesting intent but appellant failed to avail himself of this opportunity. Accordingly, we conclude that the trial court did not err in admitting Lippner's prior conviction.

■ Williams also contests the admission of extrinsic crimes evidence against Lippner and Paulk. Williams asserts that this evidence prejudiced him because the trial court failed to give the jury an instruction limiting its consideration of the evidence to only Paulk and Lippner. Williams, however,

never requested such an instruction,[10] and several former Fifth Circuit cases have held that the failure to give such an instruction in the absence of a request is not necessarily reversible error, especially when the court gives an adequate cautionary instruction in its general charge. *E.g., United States v. Alonzo,* 571 F.2d 1384, 1386 (5th Cir.), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978); *United States v. Johnson,* 569 F.2d 269, 272 (5th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978); *United States v. Alfonso,* 552 F.2d 605, 617 (5th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977).[11] Here, although at the time the evidence was introduced the trial court did not give the specific limiting instruction now urged by Williams, in its final charge the court did instruct the jury that the case of each defendant and evidence pertaining to him should be considered separately and individually. Consequently, we find no reversible error.

2. References to Marijuana Smuggling

■ Both Lippner and Williams claim that they should have been granted mistrials after coconspirator Tedder, testifying for the government, referred to a marijuana smuggling scheme involving Lippner.[12] Both appellants claim that these remarks were so prejudicial to their cases that a mistrial was required. We disagree. The statements occurred in Tedder's narration of the reason for his initial meeting with DEA agent Johannesen, and were not offered as evidence of appellants' bad character. The trial court, moreover, strongly

10. Nor does it appear from the record that Williams raised an appropriate objection on this ground. Williams' counsel had asked that he be permitted to adopt the objections raised by other counsel, but the objections to the introduction of the convictions did not include an objection on the ground that prejudice from the introduction of a conviction of a codefendant would "spill over" to the objecting defendant.

11. These cases and the case before us differ from *United States v. Diaz,* 585 F.2d 116 (5th Cir. 1978) in which the court held that when a prior conviction of the defendant for the same offense being tried is introduced, reversible error results from the trial court's failure to in-

struct the jury that the conviction is not substantive evidence of guilt. Here the trial court did instruct the jury at the time the prior convictions were introduced that "Evidence or testimony that an accused or one charged with a crime has committed an act at one time or on one occasion is not evidence or proof whatever that such person did a similar act at another time or on another occasion," and that the convictions were relevant only to intent or state of mind.

12. Williams also complains of references to marijuana smuggling contained in tapes of Tedder's conversation with DEA agent Johannesen.

instructed the jury that "the statement about marijuana has no place in this case that I can see, and you will give it no weight or consideration." The court also instructed the jury that the statement referred only to Lippner, not to Williams or Paulk. Given the circumstances, especially these strong limiting instructions, we conclude that the references to marijuana did not prejudice either appellant, and the court committed no error in denying the motions for mistrial.

### 3. Admission of the Brass Knuckles

Appellant Williams contends that the trial court erroneously admitted into evidence the brass knuckles found on his person and the gun found in the car Williams took Johannesen to in order to show the DEA agent the grocery sack full of cash. According to Williams, these items had no relevance to the case and were admitted solely to show bad character. This contention is without merit.

Our prior precedents have upheld admitting evidence such as this under Fed.R. Evid. 404 as probative of intent and/or knowledge on the part of the accused. In *United States v. Killian*, 639 F.2d 206 (5th Cir.), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981), the court held that a pistol uncovered in the search of a coconspirator's briefcase was admissible to prove a connection with a drug conspiracy. Similarly, the court in *United States v. Kloock*, 652 F.2d 492 (5th Cir. 1981) held that a false driver's license in defendant's possession was admissible, reasoning that from the false driver's license:

> the jury could infer that he was attempting to conceal his identity. One who carries false identification is often likely to have some illicit motive for doing so, and from this the jury could infer that Kloock's possession of cocaine was knowing, as the desire to avoid capture while in knowing possession of cocaine may have provided the motive for his possession of the false license.

*Id.* at 495 (footnote omitted).

The evidence presented here likewise was probative of Williams' knowledge and intent to participate in a drug conspiracy. The gun and brass knuckles were tools for the execution of the crime and provided the jury with an evidentiary basis for inferring that Williams knew he was involved in an illicit transaction and had intentionally taken steps to protect his interest. The risk of unfair prejudice from the admission of this evidence, moreover, did not substantially outweigh its probative value. The evidence was a result of an arrest for the very crime charged in this case, and was intimately connected to Williams' participation in the drug conspiracy. Accordingly we find no error in the admission of this evidence.

### B. Admission of Coconspirators' Statements

Williams urges that his conviction must be reversed because the trial court failed to hold a *James* hearing prior to trial to determine the admissibility of coconspirators' hearsay statements. We reject this contention.

As the former Fifth Circuit recently observed:

> In *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the court delineated the standards applicable to the admission of coconspirator's statements under Fed.R.Evid. 104(b) and 801(d)(2)(E). To admit the statements initially, the trial court must find by substantial independent evidence that a conspiracy existed, that the statements were made in furtherance of the conspiracy, and that the declarant and defendant were members of the conspiracy. *Id.* at 580–81. Upon proper motion at the close of all the evidence, the trial court must review the evidence and conclude that the government has shown the three predicates to admission by a preponderance. *Id.*, at 582–83. *See United States v. Gray*, 659 F.2d 1296, 1301 (5th Cir. 1981).
>
> In *James*, the court indicated that the preferred order of proof was for the government to establish the conspiracy

and the connection of the defendant and declarant with it prior to offering the statements as evidence. *James, supra,* at 582. This statement led many trial judges to conduct a "James hearing" outside the presence of the jury to develop the conspiracy evidence before admitting any coconspirators' statements. We have never mandated such a hearing, however, and in fact the *James* court noted that the order of proof was discretionary with the trial judge. *Id.* Our only concern in these cases was that the trial judge become familiar with the evidence of the conspiracy prior to admitting the coconspirators' statements, and therefore avoid a wasteful mistrial in the event inadequate evidence was produced. *See United States v. Ricks,* 639 F.2d 1305, 1309 (5th Cir. 1981).

*United States v. Nicoll,* 664 F.2d 1308, 1311–12 (5th Cir. 1982). *See United States v. Hawkins,* 661 F.2d 436, 449 (5th Cir. 1981); *United States v. Ricks, supra,* 639 F.2d at 1308–10.[13]

These cases, therefore, hold that while a *James* hearing is preferred in order to avoid a possible waste of judicial resources, it is not required in all cases. Here the only charge before the court was the conspiracy charge, and the key witness was co-conspirator Tedder. As the trial court noted, under the circumstances a *James* hearing would in essence have required trying the case twice to show the admissibility of Tedder's statements, and would itself have wasted the judicial resources *James* was designed to conserve.

## IV. Denial of Severance

■ Williams asserts that the trial court erred in denying his motion for severance

under Fed.R.Crim.P. 14 because prejudice from the admission of Lippner's and Paulk's prior convictions "spilled over" onto him. We disagree.

Both the Eleventh and former Fifth Circuits repeatedly have observed that a severance under Rule 14 is discretionary with the trial judge. As this court recently stated:

> Our analysis of this claim must begin with the accepted principle that defendants jointly indicted should be so tried. *United States v. Sullivan,* 578 F.2d 121, 123 (5th Cir. 1978). An exception to this rule may be enforced where such joinder would cause the defendant undue prejudice. F.R.Cr.P. 14. In determining a motion for severance brought on such grounds, the trial judge is empowered to exercise sound discretion in balancing possible prejudice to the defendant against governmental concern for judicial economy. *United States v. Staller,* 616 F.2d 1284, 1294 (5th Cir. 1980). Inherent in every joint trial is, of necessity, some degree of bias. Only in the event such prejudice appears to be *compelling* does severance become warranted. *United States v. Perez,* 489 F.2d 51, 65 (5th Cir. 1973).

The following test for assessing the existence of "compelling prejudice" has been adopted by this circuit:

> '[w]hether under all circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury

---

**13.** Williams cites a statement by the former Fifth Circuit in *United States v. Grassi,* 616 F.2d 1295, 1300 (5th Cir. 1980) that a pre-trial hearing to determine the admissibility of coconspirators' statements "is mandated by *United States v. James* . . . ." for the proposition that the failure to hold such a hearing is reversible error. The full quote from *Grassi,* however, is as follows:

> Following the selection of the jury but prior to the examination of the first witness before the jury, the district court held a hear-

ing to determine the admissibility of certain extrajudicial declarations that the prosecution intended to introduce under the coconspirator rule. Such a hearing is mandated by *United States v. James,* 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

Taken in context, therefore, the statement cited by Williams is no more than an explanation of why the district court held a pre-trial hearing in that case, and is not a holding that *James* required a pre-trial hearing in all cases.

keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.'

*Tillman v. United States*, 406 F.2d 930, 935 (5th Cir. 1969) (*citing Peterson v. United States*, 344 F.2d 419, 422 (5th Cir. 1965)). *See also United States v. Zicree*, 605 F.2d 1381, 1388–89 (5th Cir. 1979).

*United States v. Brock*, 669 F.2d 655, 660 (11th Cir. 1982) (footnote omitted). *See United States v. Thevis*, 665 F.2d 616, 647 (5th Cir. 1982); *United States v. Welch*, 656 F.2d 1039, 1053 (5th Cir. 1981).

No "compelling prejudice" materialized here. As we noted above, admission of the extrinsic crimes evidence against Lippner and Paulk did not prejudice Williams in light of the trial court's admonition in its final charge to the jury that the evidence and case pertaining to each defendant must be evaluated separately. This case, moreover, was not one involving a large number of defendants or complex evidence. We hold, therefore, that the trial court did not abuse its discretion in denying Williams' severance motion.

### V. Variance

Williams also argues that a fatal variance between the indictment and evidence at trial compels reversal of his conviction. Specifically, Williams asserts that the indictment charged him, Lippner, Paulk, Tedder and Mills with conspiring "with one other person known to the grand jury" but the evidence at trial failed to indicate any other person was involved in the conspiracy.

This argument borders on the frivolous. Innumerable decisions of the former Fifth Circuit have reiterated the rule that "a variance between allegations and proof is fatal only when it affects the substantial rights of the defendant by failing to sufficiently notify him of the charges against him so that he can prepare his defense and will not be surprised at trial." *United States v. Phillips*, 664 F.2d 971, 1036 (5th Cir. 1981). *See, e.g., United States v. Pearson*, 667 F.2d 12, 15 (5th Cir. 1982); *United States v. Worthington*, 642 F.2d 150, 152 (5th Cir. 1981); *United States v. Georgalis*, 631 F.2d 1199, 1205 (5th Cir. 1980). The indictment in this case amply informed Williams of the sole charge against him, and this charge, conspiracy, was pursued by the government throughout trial.

### VI. Failure to Charge a Defense Theory

Williams further complains that the trial court committed reversible error in failing to instruct the jury on his defense theory that he did not intend to purchase a controlled substance by not specially instructing the jury that "if they found from the evidence that there was no controlled substance being planned to be purchased then Williams would not be guilty." [14] Williams argues that the government's evidence showed only that he negotiated to purchase "Lemon 714's" and that he did not understand that "Lemon 714" referred to methaqualone tablets. The sole evidence introduced to support this defense was an advertisement from "High Times" magazine offering "disco biscuits" marked "Lemon 714" for sale to the general public for

---

14. Williams' counsel made no request for such an instruction until after the court delivered its charge to the jury and it retired. At that time the court gave counsel an opportunity to object to the charge, and the following colloquy took place:

THE COURT: All right, state your exceptions.

MR. SULLIVAN [Counsel for Williams]: I don't have any exceptions. The only thing I wanted to ask the Court if you would charge the fact—because the element just arose, and I didn't have a chance to make a written request—that if they found from the evidence, that there was no controlled substance being planned to be purchased, then the Defendant Williams would not be guilty, because what has developed today was there's some element of Lemon 714—and we've found that out from the transcript—that he thought he was buying, and now we find that Lemon 714 is not a controlled substance, and that's the dilemma I'm in, if Your Honor please.

In this context, we have some doubt whether Williams' counsel properly raised the issue of the special instruction, but because we find no merit to Williams' contention of error we do not address this procedural ground.

$6.50 each. Williams asserts that this evidence was sufficient to warrant the requested instruction.

We cannot agree. We recognize that our precedents have held that when "the evidence presents a theory of defense for which there is foundation in the evidence, refusal to charge on that defense is reversible error." *United States v. Taglione*, 546 F.2d 194 (5th Cir. 1977). The key to this holding is the phrase "foundation in the evidence." Here, Williams asserts that the magazine advertisement provided evidence that he did not intend to possess a controlled substance. This evidence, however, was in no way connected to Williams. Williams did not take the stand to contest his intent or to assert his reliance on the magazine ad; nor did the defense show Williams ever read "High Times." In fact, the defense even failed to show that the advertisement introduced was in circulation at the time of the conspiracy charged.[15] In light of these circumstances, the magazine ad standing alone failed to indicate anything about Williams' intent. Accordingly, we conclude that Williams was not entitled to any special instruction beyond the trial court's general charge that all elements of the conspiracy offense as delineated in the indictment had to be proven beyond a reasonable doubt.

### VII. Sufficiency of the Evidence

Williams' final assertion of error at trial is that the evidence was insufficient to sustain his conspiracy conviction. In reviewing the sufficiency of the evidence, we must sustain the conviction if the evidence, viewed in the light most favorable to the government, is such that a reasonable jury could find guilt beyond a reasonable doubt. *United States v. Garcia*, 672 F.2d 1349, 1369 (11th Cir. 1982); *United States v. Bryant*, 671 F.2d 450, 454 (11th Cir. 1982). To prove a charge of conspiracy:

> the government must establish, beyond a reasonable doubt, that a conspiracy existed, that the defendant knew of it, and

that he voluntarily participated in it. *United States v. Middlebrooks*, 618 F.2d [273] at 278; *United States v. Littrell*, 574 F.2d [828] at 832. The agreement between the coconspirators and the defendant need not be proved by direct evidence and may be inferred from concert of action. *United States v. Malatesta*, 590 F.2d [1379] at 1381; *United States v. King*, 532 F.2d 505, 508 (5th Cir.), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976). Further, it is not necessary for all coconspirators to know each other or to work together on every phase of the criminal venture. *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

*United States v. Garcia, supra*, 672 F.2d at 1369 (quoting *United States v. Wilson*, 657 F.2d 755, 758–59 (5th Cir. 1981)).

Williams asserts that the evidence failed to prove Williams agreed to join the conspiracy, arguing that nothing in the record "show[s] any involvement, much less any agreement, between Williams and the other four alleged coconspirators . . . ." The record, however, shows otherwise. Tedder arranged the meeting between Williams and DEA agent Johannesen, and a tape of that meeting, admitted into evidence, revealed Williams not only freely bargaining for the purchase of several hundred thousand methaqualone tablets but also bemoaning the false information concerning the transaction given him by Tedder. The evidence, in short, was ample for a reasonable jury to conclude beyond a reasonable doubt that a conspiracy existed, that Williams knew of it and voluntarily joined it.

### VIII. Errors in Sentencing

Both Lippner and Williams assert that the trial court's imposition of an enhanced sentence under the recidivist provisions of 21 U.S.C. § 841(b)(1)(B) was erroneous because their prior convictions, on

---

**15.** The record discloses that the magazine from which the advertisement was taken was pur-

chased the day the ad was introduced at trial.

appeal at the time of sentencing in this case, were not "final" within the meaning of the statute. Lippner, moreover, contends that the trial court's failure to inquire whether he affirmed or denied the prior conviction as required by 21 U.S.C. § 851(b) mandates resentencing. We agree with appellants' contentions concerning the finality requirement of § 841(b)(1)(B) and consequently we pretermit consideration of Lippner's separate claim under § 851.

The enhanced sentencing provision, 21 U.S.C. § 841(b)(1)(B) states:

> If any person commits such a violation after one or more prior convictions of him for an offense punishable under this paragraph, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marijuana, or depressant or stimulant substances, *have become final*, such person shall be sentenced to a term of imprisonment of not more than 10 years, a fine of not more than $30,000, or both.

(emphasis added). The issue before us, one of first impression in this circuit, is whether a prior conviction which is pending appeal is "final" for the purposes of this sentencing provision.

The question of what constitutes a "final" conviction for the purposes of the enhanced sentencing provisions has been the subject of two recent cases in other circuits. In *United States v. Allen*, 566 F.2d 1193 (3d Cir. 1977), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978), the Third Circuit faced the exact issue presented here and held that a conviction pending appeal was not final for the purposes of enhanced sentencing. The court noted that the predecessor recidivist statute used the phrase "previously been convicted" and that

the "have become final" language was adopted as part of the Comprehensive Drug Prevention and Control Act of 1970, Pub. L.No. 91–513, Title II, § 401, 84 Stat. 1260. Although the legislative history failed to make the reason for the change clear, the court concluded that it likely resulted from an attempt to avoid the problem presented by *Rogers v. United States*, 325 F.2d 485 (10th Cir. 1963), *vacated and remanded for resentencing*, 378 U.S. 549, 84 S.Ct. 1932, 12 L.Ed.2d 1041 (1964), in which the Supreme Court held resentencing was necessitated after appellant's prior conviction was overturned on appeal. This reasoning was adopted by the Ninth Circuit in *Williams v. United States*, 651 F.2d 648 (9th Cir. 1981) which extended *Allen* by holding that a conviction was not final for the purposes of § 841(b)(1)(B) until all avenues of direct review, including certiorari to the Supreme Court, had been exhausted. The Ninth Circuit rejected the government's argument that the risk of reversal on certiorari was so minute that it did not justify the additional delay in using the conviction for enhanced sentencing; the court observed instead that the rationale for the *Allen* holding—avoiding the necessity of resentencing should the prior conviction be overturned—had the same force whatever the stage of direct attack.

We agree with the Third and Ninth Circuit's analysis of the finality issue and hold that for the purposes of enhanced sentencing under § 841(b)(1)(B), a conviction is not final until all avenues of direct attack have been exhausted. The trial court, therefore, improperly relied on appellants' prior convictions, which were pending appeal at the time of sentencing in this case, to impose enhanced sentences under § 841(b)(1)(B).[16] Accordingly, we affirm

---

**16.** The government does not contest the merits of the *Allen* and *Williams* holdings concerning the finality issue, but instead argues that the appellants waived any error in the trial court's use of the non-final convictions by failing to object at trial. Even in the absence of an objection, however, we may notice on appeal "plain errors" or errors "affecting substantial rights" of the accused. Fed.R.Crim.P. 52(b).

*See United States v. Thevis*, 665 F.2d 616, 645 (5th Cir. 1982); *United States v. Adams*, 634 F.2d 830, 836 (5th Cir. 1981). Plain error occurs when the error results in "a likelihood of a grave miscarriage of justice" *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981), or "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Adams, supra*, 634 F.2d at 836. Inasmuch as our

appellants' convictions but vacate the sentence and remand for resentencing within the range permitted without regard to the prior convictions.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

prior precedents have held that the trial court's failure to strictly comply with the enhanced sentencing procedures results in an illegal sentence, *see United States v. Cevallos*, 538 F.2d 1122, 1127–28 (5th Cir. 1976), the trial court's error here resulted in the imposition of an illegal sentence which we conclude is cognizable under the plain error rule.